932 P.2d 139 (1997)
131 Wash.2d 373
Larry HILLIS and Veralene Hillis, husband and wife, Respondents,
v.
STATE of Washington, DEPARTMENT OF ECOLOGY; Mary Riveland, Director of the Department of Ecology; and Pat Spurgin, Central Regional Director of the Department of Ecology, Appellants.
No. 63399-1.
Supreme Court of Washington, En Banc.
Argued October 24, 1996.
Decided March 6, 1997.
*141 Cairncross & Hempelmann, P.S., Terrance I. Danysh, Patrick D. Brown, Seattle, amicus curiae on behalf of Coordinated Appellate Group.
Christine Gregoire, Attorney General, Jay J. Manning, Asst., Mark C. Jobson, Asst., Olympia, for Appellants.
Lathrop, Winbauer, Harrel & Slothower, F. Steven Lathrop, Ellensburg, for respondents.
*140 GUY, Justice.
The Washington State Department of Ecology asks this Court to reverse a trial court order which orders it to immediately investigate the plaintiffs' applications to appropriate public groundwater. Ecology also challenges the order because it effectively forbids Ecology from conducting assessments of the state's watersheds and because it invalidates certain policy and priority decisions made by that agency. We reverse the order in part and affirm it in part.

Facts
Larry and Veralene Hillis (Hillis) plan to build a residential development on 97 acres of land in Kittitas County. The initial subdivision application was approved by the county on the condition that Hillis install a "Group A" water system which requires a groundwater withdrawal permit from the Department of Ecology (Ecology). In 1992, Hillis filed nine applications for water rights. Because of Ecology's delay in processing the applications, the Kittitas County Board of *142 Commissioners allowed Hillis to use two "Group B"[1] community water systems for the first phase of the development until the water right for a Group A system could be obtained. A water right permit is not required for withdrawal of public water in an amount not exceeding 5,000 gallons per day for single or group domestic uses or other specific purposes. RCW 90.44.050. However, the record reflects that the Hillis applications for water seek far in excess of that amount. Hillis still wishes to provide water to the entire development using a Group A water permit.
In October 1994, Hillis sought a writ of mandamus from the superior court asking the court to order Ecology to conduct an investigation and decide whether to issue the water permits. Hillis argued that Ecology had a statutory duty under the water code, RCW 90.03, to conduct investigations on applications for the appropriation of public waters and that it had failed to fulfill that duty in a timely manner.
Ecology replied that the central regional office of the Water Resources Program of the Department of Ecology had over 2,000 pending applications for water rights in that region and that 1,178 of those applications had been filed before the Hillis applications. Statewide, there are about 5,000 applications filed asking for the appropriation of public water. Ecology showed that the 1993 Legislature had cut the budget of the water permitting program by 63 percent and that Ecology had therefore been forced to drastically reduce the number of water permitting staff. Ecology submitted evidence about the complex geohydrologic conditions which exist in the Kittitas Valley and the high degree of prior appropriation of the surface and groundwater in the Yakima River drainage basin. Ecology also presented evidence that many protests had been filed opposing the Hillis applications on the grounds that the Hillis's proposed use of water could have negative impacts on local wells used for domestic water.
The trial court found that, historically, Ecology had processed groundwater right applications generally in the order in which they were received. (This finding of fact is challenged on appeal.) The court found that in the last several years Ecology has faced problems of an increased volume of water right applications, insufficient staff to process the applications, and other factors which caused a tremendous backlog. These factors include a growing recognition of the connection between groundwater and surface water, 10 years of drought conditions, and population growth accentuating the demand for services. The court found that in response to increased demands, Ecology started processing groundwater applications in "batches" grouped together in geographic areas to allow it to conduct one investigation, make one determination of water availability, and then to make a series of permit decisions based on that investigation.
The trial court found that in 1994, when the Legislature's mandated budget cuts became effective, Ecology's water right application backlog worsened to 2,000 applications in the central region with the Hillis applications in the approximate middle of that backlog. The court found that Ecology reassessed its ability to deliver services to fulfill its duties after the budget cuts and directed the water resource program to process water right applications by water basin under set priority criteria. Ecology ranked the state's 62 watersheds[2] in order of priority for conducting the watershed assessments. The court found that Ecology will not process or investigate any nonemergency applications in any watershed until a basin assessment is completed, or unless it believes there is sufficient groundwater in an area or there are a number of applications pending within the same hydrogeologic area.
Ecology also set criteria to determine priorities for processing of applications. The Kittitas County Commissioners (at the urging of Hillis) declared a groundwater emergency and requested Ecology to process all applications in that county. Ecology has not *143 acted on that request. The court found that, based on existing funding levels and the priorities for basin assessments, the Hillis applications will not be investigated for another five years, which will be eight years from the date of application. The trial court also found that Ecology had not followed the rule-making process of the Administrative Procedure Act as it pertains to Ecology's duty to investigate pursuant to RCW 90.03.290.
The trial court issued a "writ of mandamus."[3] The writ (1) orders Ecology to "immediately investigate" all of the Hillis's pending water applications and approve or deny them, (2) orders Ecology to consider hydrogeologic information supplied by Hillis, (3) orders Ecology not to undertake any watershed or basin assessments in advance of the investigation and timely processing of all pending groundwater applications, and (4) invalidates all of Ecology's priorities regarding pending applications, the decision to conduct watershed assessments, and the order of conducting those assessments. The writ also denies the Hillis's request for attorney fees.
We granted direct review. Ecology argues that the trial court's order violates the rights of senior water right applicants, intrudes on the funding decisions of the Legislature, and interferes with the administrative discretion of Ecology to implement the water resource statutes. Ecology also assigns error to the trial court's finding of fact 1.4 that Ecology historically processed groundwater applications based on the application date. Ecology also assigns error to the trial court's ruling that certain of its administrative actions constituted "rules" which should have been enacted by rule making in accord with the Administrative Procedure Act, RCW 34.05. Hillis cross appeals, arguing the trial court should have awarded attorney fees.

Issues
1. Did the trial court err in ordering Ecology to immediately decide the Hillis applications?
2. Did the trial court err in ordering Ecology not to conduct watershed assessments until all pending water permit applications were decided?
3. Does the record support the trial court's finding that Ecology historically processed applications generally in the order in which they were filed?
4. Did the trial court err in invalidating certain of Ecology's decisions because the agency did not engage in rule-making procedures?
5. Did the trial court err in refusing to award attorney fees to Hillis?

Standard of Review
With some limited exceptions not relevant here, the Administrative Procedure Act (APA) provides the exclusive means of judicial review of agency action. RCW 34.05.510; Neah Bay Chamber of Commerce v. Department of Fisheries, 119 Wash.2d 464, 468, 832 P.2d 1310 (1992). The standard of review used to decide if an agency action or inaction is valid is prescribed by the act. RCW 34.05.570(1)(b); Neah Bay, 119 Wash.2d at 468, 832 P.2d 1310. The burden of demonstrating the invalidity of agency action is on the party asserting invalidity. RCW 34.05.570(1)(a). Hillis, therefore, bears this burden.
The APA sets out somewhat different standards for judicial review depending on whether the agency action being reviewed pertains to (1) rules, (2) adjudicative proceeding, or (3) other agency action, including inaction. Agency inaction (such as Ecology's failure to act on the Hillis applications) is judicially reviewed by a petition filed pursuant to RCW 34.05.570(4)(b). Judicial review of rules (such as Hillis's contention that the directives of Ecology amount to rules which must comply with rule-making procedures) *144 is governed by RCW 34.05.570(2). The relevant standards of review are discussed below in the relevant discussions regarding each part of the trial court's order.

Analysis
Issue One: Did the trial court err in ordering Ecology to immediately decide the Hillis applications?
The trial court ordered Ecology to "immediately investigate and completely process in a timely fashion all of [Hillis's] nine ... applications and render a decision either approving or denying each such application."[4]
The APA provides:
A person whose rights are violated by an agency's failure to perform a duty that is required by law to be performed may file a petition for review ... seeking an order pursuant to this subsection requiring performance.
RCW 34.05.570(4)(b). See also RCW 34.05.574. However, relief for a person aggrieved by an agency's failure to perform a duty required by law may be granted by a court only if the court determines that the inaction is:
(i) Unconstitutional;
(ii) Outside the statutory authority of the agency or the authority conferred by a provision of law;
(iii) Arbitrary or capricious; or
(iv) Taken by persons who were not properly constituted as agency officials lawfully entitled to take such action.
RCW 34.05.570(4)(c).
The argument here is that Ecology acted in an arbitrary or capricious manner in not acting on the Hillis applications or that it acted outside its statutory authority. Agency action is arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances. Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous. E.g., ITT Rayonier, Inc. v. Dalman, 122 Wash.2d 801, 809, 863 P.2d 64 (1993); Kendall v. Douglas, Grant, Lincoln, & Okanogan Counties Pub. Hosp. Dist. 6, 118 Wash.2d 1, 14, 820 P.2d 497 (1991).
To determine if Ecology acted outside of its authority or in an arbitrary or capricious manner, it is necessary to understand its responsibilities with regard to the public waters of the state. As a general matter, groundwater in Washington is publicly owned. Department of Ecology v. United States Bureau of Reclamation, 118 Wash.2d 761, 766, 827 P.2d 275 (1992); Olds-Olympic, Inc. v. Commercial Union Ins. Co., 129 Wash.2d 464, 476, 918 P.2d 923 (1996); RCW 90.44.040; see RCW 90.03.010. RCW 90.44.040 provides that "[s]ubject to existing rights, all natural ground waters of the state... are hereby declared to be public ground waters and to belong to the public and to be subject to appropriation for beneficial use under the terms of this chapter and not otherwise."
Private individuals may acquire a right to use these public waters by obtaining a water right (also known as a right of appropriation). United States Bureau of Reclamation, 118 Wash.2d at 766, 827 P.2d 275. Ecology must investigate an application for a permit to withdraw public groundwater pursuant to the four-part test of RCW 90.03.290. RCW 90.44.060. RCW 90.03.290 provides in relevant part:
When an application ... has been filed, the same shall be placed on record with the department [of Ecology], and it shall be its duty to investigate the application, and determine what water, if any, is available for appropriation, and find and determine to what beneficial use or uses it can be applied.... The department shall *145 make and file as part of the record in the matter, written findings of fact concerning all things investigated, and if it shall find that there is water available for appropriation for a beneficial use, and the appropriation thereof as proposed in the application will not impair existing rights or be detrimental to the public welfare, it shall issue a permit stating the amount of water to which the applicant shall be entitled and the beneficial use or uses to which it may be applied.... But where there is no unappropriated water in the proposed source of supply, or where the proposed use conflicts with existing rights, or threatens to prove detrimental to the public interest, having due regard to the highest feasible development of the use of the waters belonging to the public, it shall be [the] duty of the department to reject such application and to refuse to issue the permit asked for.... In determining whether or not a permit shall issue upon any application, it shall be the duty of the department to investigate all facts relevant and material to the application.
Therefore, RCW 90.03.290 requires Ecology to make essentially four determinations prior to the issuance of a water use permit:
(1) what water, if any, is available;
(2) to what beneficial uses the water is to be applied;
(3) will the appropriation impair existing rights; and
(4) will the appropriation detrimentally affect the public welfare.
E.g., Peterson v. Department of Ecology, 92 Wash.2d 306, 314, 596 P.2d 285 (1979). Under this statute, the "DOE must reject the application and refuse to issue a permit if there is no unappropriated water available, if withdrawal will conflict with existing rights, or if withdrawal will detrimentally affect public interest." Jensen v. Department of Ecology, 102 Wash.2d 109, 112-13, 685 P.2d 1068 (1984); United States Bureau of Reclamation, 118 Wash.2d at 767, 827 P.2d 275. Ecology's decision whether to grant a permit to withdraw public groundwater is within the exercise of its discretion. Jensen, 102 Wash.2d at 113, 685 P.2d 1068; Peterson, 92 Wash.2d at 314, 596 P.2d 285. Once an applicant is granted a right to withdraw public groundwater, then the date of the right relates back to the date of application. Jensen, 102 Wash.2d at 114, 685 P.2d 1068; RCW 90.03.340.
Ecology agrees that RCW 90.03.290 gives it a duty to process water rights applications. However, it argues that it can conduct only as many investigations as the Legislature is willing to fund and can act only as quickly as its budget allows.
The record indicates that the Legislature has drastically cut the budget of the water rights permit program. In spite of its knowledge of an existing backlog in water permit applications, it cut the budget for the water rights permit program by 63 percent. In 1993, the Legislature provided in the budget for the Department of Ecology that:
The appropriations in this section are subject to the following conditions and limitations:
....
(8) For fiscal year 1994, $3,750,000 of the general fundstate appropriation is provided to administer the water rights permit program. For fiscal year 1995, not more than $1,375,000 of the general fund state appropriation may be expended for the program unless legislation to increase fees to fund fifty percent of the full cost of the water rights permit program, including data management, is enacted by June 30, 1994.
Laws of 1993, 1st Spec.Sess., ch. 24, § 303.
The 1993 Legislature also made findings regarding water permits and fees (and created a task force on water rights permits), which provide:
The legislature finds that a water right confers significant economic benefits to the water right holder. The fees associated with acquiring a water right have not changed significantly since 1917. Water rights applicants pay less than two percent of the costs of the administration of the water rights program. The legislature finds that, since water rights are of significant value, water rights applicants should contribute more to the cost of administration of the water rights program.

*146 The legislature also finds that an abrupt increase in water rights fees could be disruptive to water rights holders and applicants. The legislature further finds that water rights applicants have a right to know that the water rights program is being administered efficiently and that the fees charged for various services relate directly to the cost of providing those services.
Therefore, the legislature creates a task force to review the water rights program, to make recommendations for streamlining the application process and increasing the overall efficiency and accountability of the administration of the program, and to return to the legislature with a proposal for a fee schedule where the fee levels relate clearly to the cost of services provided.
Laws of 1993, ch. 495, § 1 (codified as a Finding to RCW 90.03.470).
The task force, comprised of legislators and representatives from agriculture, aquaculture, business, cities, counties, Ecology, environmentalists, water recreation interests, water utilities, and hydropower interests, was given duties which included: (1) conducting a comprehensive review of water rights fees, (2) identifying the costs associated with the various activities provided by the water rights program, (3) identifying appropriate accountability measures for Ecology to employ in administration of the program while recognizing Ecology's legal obligations under the doctrine of prior appropriation, (4) identifying the activities which should be eligible for cost recovery from fees, (5) reviewing the process of marine water users, (6) considering the fees for nonconsumptive water users, (7) reviewing the fees and accounting methods for dam safety programs, (8) identifying the appropriate distribution of responsibility between the applicant and Ecology for the provision of technical information and analysis, (9) establishing a reasonable time framework for completion of new and pending water rights applications, and (10) analyzing the staff and funding levels required to meet the framework. By the end of 1993, the task force was to provide recommendations to Ecology on ways to improve the efficiency of the program, propose recommendations to the Legislature on statutory changes, and propose a new fee schedule for the water rights program which funded, through fees, 50 percent of the cost of the activities and services provided by the program. Laws of 1993, ch. 495, § 3. We describe these tasks to emphasize the complexity of the problem facing the state in the water permitting program and the allocation of its costs.
The task force made recommendations to the Legislature, and in 1994 a complex water fee bill with the stated purpose of "catch[ing] up on the backlog of water right applications in as short a period as possible" passed the Senate. Reengrossed Second Substitute S. 6291, 53rd Legislature, 1st Spec.Sess. (1994). However, the bill failed to pass the House, and subsequent legislative sessions failed to pass any new fee schedule. The budget proviso quoted above, therefore, continued in effect and resulted in a 63 percent reduction in the budget of the water rights permit program.[5] The staff for water rights processing was cut from 54 positions to 19 statewide as a result of the budget cuts. In the central region, the three hydrogeologist positions were reduced to one and other staff positions were cut.
Ecology responded to the budget cuts by setting priorities for the applications it would process first. Top priority was to be given to public health emergencies, such as the contamination of domestic water sources. Priority was also to be given to applications for changes to existing water rights and to applications for short-term uses for public projects such as road building. In a series of *147 agency publications entitled "Focus Sheets," "Questions and Answers," "Reports," and letters, Ecology informed water rights applicants and the public of these criteria and of the plan to conduct "watershed assessments." Ecology announced that it had plans to conduct watershed (basin) assessments on the state's 62 watersheds that would help make decisions on applications in the same watershed more efficiently. Ecology also obtained $500,000 in emergency funds from the Governor for the initial watershed assessments to be conducted by private consultants. Whether Ecology acted in an arbitrary or capricious manner or acted outside its statutory authority in failing to investigate the Hillis applications has to be decided in the context of its legislatively mandated budget restraints.
An agency generally may not make expenditures in excess of legislative appropriations. See Const. art. VIII, § 4 (amend.11);[6] RCW 43.88.130.[7] Although Ecology does have a statutory duty to investigate water rights applications for public water, no time limit is stated in that statute,[8] and we have recognized that a statutory right can be enforced only up to the funding provided by the Legislature. In City of Ellensburg v. State, 118 Wash.2d 709, 715, 826 P.2d 1081 (1992) (quoting Pannell v. Thompson, 91 Wash.2d 591, 599, 589 P.2d 1235 (1979)), we explained that the courts would not usually order an agency to do something it had not been funded to do:
"Appellants ... fail to recognize a legislative fact of life. Legislatures often provide laudable programs but may fail to fund them adequately or may decline to fund them at all. The decision to create a program as well as whether and to what extent to fund it is strictly a legislative prerogative.
We will not direct the Legislature to act in this regard unless creation of a program and/or the funding thereof is constitutionally mandated."
No party claims that an individual has a constitutional right to appropriate public groundwater. Therefore, the constitutional exception of Pannell and Ellensburg does not apply in this case. There is no statutory right to groundwater without a permit, except for the 5,000 gallons per day allowed for domestic type uses. RCW 90.44.040, .050. In Ellensburg, we concluded that the power of appropriation is vested in the Legislature and it is a rare case where the judiciary interferes with this power. Ellensburg, 118 Wash.2d at 717-18, 826 P.2d 1081 (citing Const. art. VIII, § 4 and RCW 43.88.130).
If we were to uphold the trial court's order directing Ecology to "immediately" process the Hillis applications, we presume many of the 5,000 other applicants, individually or in a class action, would seek to obtain an identical order. Based on this Court's decision to uphold such an order, a superior court would have no choice but to order Ecology to immediately investigate all 5,000 applications, regardless of their complexity. This would put Ecology in the legally untenable position of either violating a court order or violating the state constitution and RCW 43.88.130, which forbid agencies to expend any money in excess of the amount appropriated for a given purpose. Such action by this Court would only further add to the significant problems of the present water permitting system.
While it may be very tempting for this Court to order the Legislature to appropriate a reasonable amount of funds (or attempt to do so through court orders to Ecology) so that water rights applicants could have their requests for water decided in a timely manner, such action would violate *148 the separation of powers doctrine. The separation of powers doctrine ensures that the fundamental functions of each branch of government remain inviolate. Carrick v. Locke, 125 Wash.2d 129, 135, 882 P.2d 173 (1994). The legislative branch generally has control over appropriations. E.g., In re Juvenile Director, 87 Wash.2d 232, 242, 552 P.2d 163 (1976); Ellensburg, 118 Wash.2d at 718, 826 P.2d 1081. While we may find a waiting period of years to be intolerable, we would find it even more intolerable for the judicial branch of government to invade the power of the legislative branch. Just because we do not think the legislators have acted wisely or responsibly does not give us the right to assume their duties or to substitute our judgment for theirs. The judiciary is the branch of government that is empowered to interpret statutes, not enact them. While there are special situations when the courts can and should order the expenditure of funds,[9] specific appropriation to fund a statutory right, not involving constitutional rights or judicial functions, is normally beyond our powers to order. If every time we decided that the Legislature had not appropriated enough funds to an agency for a given purpose we could rule that the agency was "arbitrary or capricious" for failing to act and order the agency to act, then the funding of all agency action would be effectively shifted from the Legislature to the courts. We must decide whether agency action is arbitrary or capricious under the APA in light of the funds which the Legislature has appropriated for a given purpose.
The question properly before us is whether, given the level of funding which Ecology had been appropriated to conduct the water rights program, its decisions to prioritize the applications (by emergency, short-term use and changes to existing uses) and to conduct watershed assessments were arbitrary or capricious. Given the level of appropriations and the number of applications for withdrawal of groundwater, we cannot conclude that Ecology acted in an arbitrary or capricious manner in not yet having conducted the investigation of the Hillis applications. Neither Ecology's decisions to prioritize emergency applications nor its decisions to batch applications by watershed are arbitrary or capricious or beyond its statutory authority. While the decisions regarding the order of priorities and the definition of emergency applications may be decisions which are subject to rule making (discussed below), we cannot conclude on the record before us that they were arbitrary or capricious decisions or ones beyond the authority of the agency. Ecology's actions in conducting the water permit process is within the scope of its statutory duty. RCW 90.44.050, .060; RCW 90.03.290; RCW 43.27A.090.
In order to be arbitrary or capricious, the decisions would have to be willful and unreasoning and taken without regard to the attending facts or circumstances. The record does not support such a conclusion. It is obviously not arbitrary or capricious for Ecology to give priority to emergency applications, such as those dealing with the contamination of domestic water. Similarly, it is reasonable to give priority to changes in existing uses, as there is no necessity for a determination of water availability or impairment of existing rights. It is also reasonable to give priority to short-term water uses for public projects because the water will be appropriated only temporarily and, hence, will have relatively little effect on other water users or applicants. Conversely, the decisions for new appropriations in central Washington are complex and time-consuming and demand much of the agency's resources. There is evidence in the record, and in case law from this Court, that there is not enough water to meet all the existing needs of the present water rights holders in the Yakima basin. There is also evidence that the investigation necessary to determine whether the approval of the Hillis applications would impair existing rights is a complicated issue. There are many applicants ahead of Hillis who have applied for the use of water from the same water source. There is evidence in the record that the most efficient use of the agency's limited resources is to conduct watershed *149 assessments and then make many decisions in a given watershed with the data gathered from the assessment.
There is no simple or quick fix to the problem of appropriating the public waters of the state.[10] If decisions are made too quickly, without due regard to the rights of senior water right holders, then developments will be built which could be left without water during drought years.
All parties concede that an applicant's place in line within any one water source[11] is a relevant consideration. See Schuh v. Department of Ecology, 100 Wash.2d 180, 187, 667 P.2d 64 (1983) (applicant's place in line for a water permit is an existing right to be considered); Jensen, 102 Wash.2d at 114, 685 P.2d 1068 (sole right was to his place in line). We find no statutory mandate for each application statewide to have to be investigated individually in a strictly chronological order. Both parties now appear to agree that within a given water source, the applications should be considered in order of application. However, among applicants requesting water from different water sources, there are other reasonable criteria. Evidence in the record indicates that the approach of conducting investigations on a watershed basis is logical and efficient. Testimony was introduced which showed that the purpose of the watershed assessment approach was to put in place a system that would allow Ecology to be more efficient in processing permit applications so as to be able to reduce the backlog of applications as quickly as possible. The evidence was that the watershed assessment approach was an efficient way for Ecology to determine two of the four statutory criteriawater availability and impact on senior water rights. The evidence was that the watershed assessment approach was not separate from the permitting process but an integral part of that process. The record indicates that the decision to process applications for emergency situations, for short-term needs, and where changes to existing water rights are sought, was not arbitrary or capricious. (Whether such priority setting should have been conducted by rule-making procedures is discussed below.)
One commentator, while recognizing that agency inaction remains subject to judicial review under the APA, also points out that the act authorizes judicial inquiry into the "arbitrariness" of an agency's failure to act. William R. Andersen, The 1988 Washington Administrative Procedure ActAn Introduction, 64 Wash. L.Rev. 781, 844 (1989). See RCW 34.05.570(4)(c)(iii). Professor Andersen states:
Turning to the intensity with which courts are to review agency inaction, the intensity level probably will be relatively low in most cases. The Act makes the arbitrary and capricious test the appropriate *150 formula to use.... Certainly, any judicial appraisal of the rationality of an agency's decision not to act must be sensitive to the special problems of priority setting and resource allocation which may lie behind a particular case of agency inaction. Where inaction is the result of determinations of this sort, a court should proceed with great caution.
Andersen, supra, at 845.
Given the severely reduced budget, the large number of applications pending, and the complex investigation required to determine the availability of water and the rights of senior water rights holders, we cannot conclude that Ecology's inaction on the Hillis applications was arbitrary or capricious. Ecology was unable to allocate money from any other accounts to process water permit applications because the Legislature had made the budget reduction an express condition and limitation of Ecology's budget.
Additionally, the part of the trial court's order which orders Ecology to immediately process the Hillis applications would violate the rights of other applicants from the same water source who filed their applications on an earlier date. As Ecology correctly points out, it cannot determine if there is water available for Hillis until it has processed the senior applicants who seek water from the same water source.
Issue Two: Did the trial court err in ordering Ecology not to conduct watershed assessments until all pending water permit applications were decided?
The trial court concluded that Ecology must perform its statutory duty to "investigate each water right application individually and in a timely manner." The trial court's order states that "Ecology shall not undertake any watershed or basin assessments in advance of the investigation and timely processing of all pending ground water right applications." Ecology argues that this order will forbid it from ever conducting watershed assessments since new applications are continually filed. The record reflects that Ecology receives in excess of 1,000 applications to use public water each year. Presumably, so long as there is public water available in a water source there will be applications to appropriate that water.
The judicial standard of review is contained in RCW 34.05.570(4)(c), which provides:
Relief for persons aggrieved by the performance of an agency action, including the exercise of discretion ... can be granted only if the court determines that the action is:
(i) Unconstitutional;
(ii) Outside the statutory authority of the agency or the authority conferred by a provision of law;
(iii) Arbitrary or capricious; or
(iv) Taken by persons who were not properly constituted as agency officials lawfully entitled to take such action.
RCW 34.05.574 provides that in reviewing matters within agency discretion, the court shall limit its function to assuring that the agency has exercised its discretion in accordance with law and shall not itself undertake to exercise the discretion that the Legislature has placed in the agency.
The question here is whether Ecology's action in conducting watershed assessments prior to acting on many of the water rights applications was arbitrary or capricious or beyond its statutory authority.
Ecology does have specific statutory authority to conduct assessments of watersheds. RCW 43.27A.090(7); see also Water Resources Act of 1971, RCW 90.54.
The evidence in the record does not support a conclusion that Ecology's conduct was arbitrary or capricious in deciding to use watershed or basin assessments as a means to investigate the availability of water and the rights already appropriated in a given basin. The evidence indicates that the watershed assessments would compile and analyze information needed to make decisions on many applications and would avoid duplication that occurs when staff research one application at a time. There is also evidence that in addition to its regular budget, Ecology obtained $500,000 from the Governor's emergency funds to fund watershed assessments to expedite the decisions on permit *151 applications for individual applicants. Ecology's published policy statements explain that the watershed assessment process would be used in an attempt to accelerate permit decisions. There was evidence that the watershed assessment approach would result in investigation of the Hillis applications sooner than if applications were investigated strictly in the order submitted. The record does not support the allegation that Ecology was conducting watershed assessments totally in lieu of investigations for water rights. Some individual permitting (mostly in the priority categories) was occurring while the watershed assessments were being conducted. The testimony was that the basin assessments were an integral part of the investigation mandated for the permitting process.
Professor Andersen has explained that substantial judicial deference to agency views would be appropriate when an agency determination is based heavily on factual matters, especially factual matters which are complex, technical, and close to the heart of the agency's expertise. Andersen, supra, at 832. We agree and have recognized that Ecology is in a far better position to judge what is in the public interest regarding water permits than a court. Schuh, 100 Wash.2d at 187, 667 P.2d 64. We cannot substitute our opinion for that of the agency entrusted to make such decisions that some other kind of investigation, rather than by watershed, would be more efficient to expedite the permitting system. Indeed, there is evidence in the record that watershed assessments were recommended by the Water Rights Task Force and the Water Resources Forum. We conclude that Ecology may, in its discretion, proceed with watershed assessments. (However, whether watershed assessments can be used as a prerequisite for decisions on water applications prior to rule making is discussed below.)
Issue 3: Does the record support the trial court's finding of fact that Ecology historically processed applications in the order in which they were filed?
Ecology challenges the finding of fact that it has historically processed applications generally by application date. We review the trial court's findings of fact to see if they are supported by substantial evidence in the record. Nordstrom Credit, Inc. v. Department of Revenue, 120 Wash.2d 935, 939, 845 P.2d 1331 (1993). We find no evidence in the record that applications were processed statewide with the application date as the only criteria. The evidence is that only if applications are competing for water from the same water source must they be processed according to application date. Applications were usually "batched" together for efficiency purposes. The evidence showed that Ecology had always had somewhat of a backlog, and the best use of staff time was to assign a person to a geographic area. In addition to application dates, the other factors Ecology looked at to determine the priority of investigations included: the number of applications pending in an area, how much information was already available on a given area, how much water was available in a given aquifer, whether it was known that new rights could be granted without impairing existing water rights, and whether there was a contamination issue or other emergency in a public water supply. We conclude that the trial court's finding of fact that applications were processed by application date is not supported by substantial evidence in the record.
Issue 4: Did the trial court err in invalidating certain of Ecology's decisions because the agency did not engage in rule-making procedures?
While the policies and procedures adopted by Ecology in response to cuts in the funding of the permitting program were within the statutory authority of the agency and were not arbitrary or capricious, the decisions were nonetheless subject to the rule-making process of the APA.
It appears the decisions which the trial court was invalidating were: (1) Ecology's decisions regarding what kinds of water applications should be given priority (emergencies involving public health, changes of existing rights, and short-term public projects), (2) use of the watershed assessment process for the purpose of making decisions on applications for water rights, and (3) the ranking of watersheds for assessment.
*152 The judicial standard of review is contained in RCW 34.05.570(2)(c), which provides:
In a proceeding involving review of a rule, the court shall declare the rule invalid only if it finds that: The rule violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary or capricious.
In this case, Hillis asserts that Ecology's decisions were made without compliance with statutory rule-making procedures. Rules are invalid unless adopted in compliance with the APA. Simpson Tacoma Kraft Co. v. Department of Ecology, 119 Wash.2d 640, 649, 835 P.2d 1030 (1992). However, for rule-making procedures to apply, an agency action or inaction must fall into the APA definition of a rule. Failor's Pharmacy v. Department of Soc. & Health Servs., 125 Wash.2d 488, 493, 886 P.2d 147 (1994). Under the APA, "rule" means
any agency order, directive, or regulation of general applicability ... (c) which establishes, alters, or revokes any qualification or requirement relating to the enjoyment of benefits or privileges conferred by law.... The term ... does not include (i) statements concerning only the internal management of an agency and not affecting private rights or procedures available to the public....
RCW 34.05.010(15).
Ecology acknowledges its decisions have "general applicability" to all pending water right applicants. The right to apply and be considered under the statutory criteria for a groundwater withdrawal permit is a "benefit or privilege" conferred by statute. RCW 90.03.290. However, to be classified as a "rule," it is not sufficient that a directive be of general applicabilityit must also fall under one of the categories in the definition of a rule in RCW 34.05.010(15). State v. Straka, 116 Wash.2d 859, 868, 810 P.2d 888 (1991).
Therefore, the question here is whether the procedures and priorities used by Ecology in response to its budget cuts were new "qualifications or requirements" relating to the benefit conferred by law. Hillis argues that having to wait for a basin assessment or to fit into one of the priority groups are new qualifications or requirements relating to the processing of an application for a water permit. Ecology argues that the qualifications or requirements for a water permit have not changed and are the same four criteria set by RCW 90.03.290, i.e., availability, no impairment of existing rights, beneficial use, and no detrimental effect on the public welfare.
While Ecology is correct that the requirements to actually acquire a water permit remain the four requirements set out in the statute, RCW 90.03.290, water applicants have the right under the statute to have their application investigated and decided upon. RCW 90.03.290 creates this right. Therefore, when Ecology sets out priorities and establishes prerequisites to those decisions, the agency should engage in rule making so the public has some input into those decisions.
Rule-making procedures under the APA involve providing the public with notice of the proposed rule and an opportunity to comment on the proposal. See RCW 34.05.320,.325. The purpose of rule-making procedures is to ensure that members of the public can participate meaningfully in the development of agency policies which affect them. Simpson, 119 Wash.2d at 649, 835 P.2d 1030; Andersen, supra, at 791; Arthur E. Bonfield, State Administrative Rule Making § 3.3.2(d) (1986); see also RCW 34.05.001.
The remedy when an agency has made a decision which should have been made after engaging in rule-making procedures is invalidation of the action. Failor's Pharmacy, 125 Wash.2d at 497, 886 P.2d 147; RCW 34.05.570(2)(c). The remedy is not for the courts to make the decision or set the priorities for the agency. What priorities and procedures Ecology uses is within its discretion, after rule making has occurred. The APA provides that:
In reviewing matters within agency discretion, the court shall limit its function to assuring that the agency has exercised its discretion in accordance with law, and shall not itself undertake to exercise the discretion *153 that the legislature has placed in the agency. The court shall remand to the agency for modification of agency action unless remand is impracticable or would cause unnecessary delay.
RCW 34.05.574(1)(b).
Since we conclude that the procedures and priorities set by Ecology are new requirements or qualifications relating to the benefit of having a water right application investigated, Ecology's decisions, made without rule making, must be invalidated. Ecology will have to engage in rule-making procedures prior to using its decisions on priorities for conducting investigations on applications, its decision to conduct watershed assessments prior to deciding most applications, and its ranking of watersheds for assessment. Public input does not dictate the ultimate decisions of the agency, but it does allow all interested parties to have a voice before the decisions are made.
While Ecology may conduct watershed assessments, it may not make the completion of a watershed assessment a requirement or prerequisite for decisions on applications until it has engaged in rule-making procedures. As the trial court correctly decided, Ecology may use any data gathered in the past for its decision making on permits.
On remand, it is within the discretion of the agency what specific procedures of the APA Ecology chooses to use. RCW 34.05.310. Rule making need not always significantly increase the time necessary to implement policy, as argued by Ecology. RCW 34.05.350 allows for immediate adoption of temporary emergency rules while regular rule making proceeds. To the extent that Ecology's decisions or priorities comply with the requirements of RCW 34.05.350, it may choose to use the emergency rule-making procedures.
Issue 5: Did the trial court err in refusing to award attorney fees to Hillis?
At the trial court Hillis sought attorney fees, arguing that Hillis had acted as a "private attorney general" and had established a common benefit for the entire class of water applicants. Ecology responded that the court's order jumped the Hillis applications ahead of a thousand senior pending applicants in the central region and that those applicants had not been benefited by the order. The trial court denied the request for fees, finding that the court order applies only to plaintiffs and not to others similarly situated.
We have held that the "private attorney general doctrine" does not apply in Washington and that any change on this issue should come from the Legislature and not the judiciary. Blue Sky Advocates v. State, 107 Wash.2d 112, 121, 727 P.2d 644 (1986). Washington follows the "American rule" on the award of attorney fees. Attorney fees are not recoverable by the prevailing party absent a contract, statute, or recognized ground of equity. E.g., Rettkowski v. Department of Ecology, 128 Wash.2d 508, 514, 910 P.2d 462 (1996). Hillis has shown no grounds for an award of attorney fees.

Conclusion
We reverse the parts of the trial court's order which order Ecology to process the Hillis applications immediately and which forbid Ecology from conducting watershed assessments prior to deciding all applications. We find that Hillis has not met the burden to show that Ecology acted beyond its statutory authority or in an arbitrary or capricious manner. We affirm the trial court in concluding that Ecology should engage in rule making with regard to the setting of priorities for deciding water applications, for using watershed assessments as a preliminary step to deciding nonemergency water applications, and for setting the order in which watershed assessments are to be conducted. We affirm the trial court's order denying attorney fees.
DOLLIVER, SMITH, JOHNSON and TALMADGE, JJ., concur.
SANDERS and MADSEN, JJ., concurring in part/dissenting in part by separate opinion.
DURHAM, C.J., and ALEXANDER, J., concurring in concurrence/dissent by separate opinion.
*154 ALEXANDER, Justice (concurring in concurrence/dissent),
I agree with the concurrence/dissent of Justice Sanders. I choose to write specially because I wish to indicate that I am not unsympathetic with the Department of Ecology's (DOE) claim that it lacks sufficient funds and, as a consequence, adequate staff to timely process the many water right applications that have been, and most likely will continue to be, filed with it. DOE has clearly been placed in a difficult situation and I feel confident that its failure to process these water right applications does not reflect a lack of dedication or any animus toward the applicants.
DOE's defense of insufficient funds is, however, of little solace to Larry and Veralene Hillis, the applicants whose case is before us. The plain fact is that DOE has an obligation pursuant to RCW 90.03.290 to process water right applications. Despite the existence of this mandatory duty, it has not acted on any of Mr. and Mrs. Hillis's nine water right applications during the almost five years that have gone by since the applications were filed and the fees were paid. Further, DOE cannot even assure this court that it will act on these applications in the foreseeable future. In my judgment, this complete failure by DOE to timely fulfill its statutory obligation is oppressive and contrary to law and, as a result, is arbitrary and capricious conduct. Furthermore, even assuming that a lack of funding somehow excuses DOE's failure to process the numerous applications that have been filed with it, DOE can hardly claim it lacked sufficient funds to process the nine applications that are the focus of the case before us.
DOE seems to suggest that a ruling in favor of these applicants would open the floodgates for similarly situated applicants to bring forth lawsuits to force compliance with the statute. While I am skeptical that this would occur, such a turn of events might focus appropriate attention on the issue and cause the Legislature to either provide DOE with adequate funds to meet its statutory obligations in a timely fashion or, in the alternative, amend the statute so as to relieve DOE of its statutory duty to perform this obligation.
The trial court's order requiring DOE to investigate and process the nine applications filed by Mr. and Mrs. Hillis in a timely fashion should be affirmed.
SANDERS, Justice (concurring in part, dissenting in part).
RCW 90.03.290 creates a duty on the part of the state and a corresponding legal right on the part of the applicant. It provides in part:
When an application complying with the provisions of this chapter and with the rules and regulations of the department has been filed, the same shall be placed on record with the department, and it shall be its duty to investigate the application.... [I]f it shall find that there is water available for appropriation for a beneficial use, and the appropriation thereof as proposed in the application will not impair existing rights or be detrimental to the public welfare, it shall issue a permit....
RCW 90.03.290 (emphasis added).
Mr. Hillis seeks protection of his legal right to have his applications processed. This court should provide that protection by affirming the trial court. The trial court properly ordered the Department of Ecology (DOE) to "immediately investigate and completely process in a timely fashion all of plaintiffs' nine pending ground water [ ] applications and render a decision either approving or denying each such application." Clerk's Papers (CP) at 164-65. In so doing, it protected Mr. Hillis's statutory rights against infringement by his own government, and, frankly, I cannot understand why the majority opinion does not do the same.
The trial court made several findings of fact to support its order. DOE has not assigned factual error to any of these findings, and, therefore, they are verities for the purpose of this appeal. Painting & Decorating Contractors of Am., Inc. v. Ellensburg Sch. Dist., 96 Wash.2d 806, 814, 638 P.2d 1220 (1982).
Mr. Hillis filed nine water rights applications with DOE, four on August 31, 1992, and five on November 25, 1992, but to date, DOE has acted on none of them. CP at 157 (Finding 1.3).
*155 In 1993 DOE demanded from Mr. Hillis an additional $900 ($100 per application) "just to keep the existing applications active...." CP at 158 (Finding 1.5). Hillis paid for the application fees in full; however, "[t]hese funds went to general Ecology operating expenses and did nothing to further the investigation of the Hillis applications." CP at 158 (Finding 1.5).
DOE acknowledges that the applications from Hillis were complete, ready for investigation, and that Ecology required nothing more from Hillis. Further, Ecology admits it does not intend to investigate Mr. Hillis's applications for another five years (the year 2000), refusing to do anything whatsoever on Mr. Hillis's applications for a total elapsed period of at least eight years, if even then. CP at 159 (Finding 1.7).
The record demonstrates Mr. Hillis is enduring severe economic and emotional hardship as a result of Ecology's refusal to perform its legal duty. In point of fact, he may lose his entire investment and incur additional general and special damages. CP at 133; CP at 143 (Finding 2.2). When government establishes a permit process as a condition to one's use of his or her own land, and then refuses access to the process, extreme hardship on the part of the citizen is the inevitable result.
It is also interesting to note DOE talks out of both sides of its mouth. For example, the attorney general represented to the trial court on November 28, 1994 that DOE would need another two years to process Hillis's applications. CP at 193. However, by the time this opinion is published, substantially more than two years from that belated representation will have elapsed. Moreover, according to current DOE claims, Mr. Hillis will now be further from having his applications processed than he was at the time the attorney general made the representation in November of 1994.
The record also shows DOE could well process these very applications (with sufficient incentive) within two to six weeks. Ex. 10.
Closely tracking the terms and conditions of the statute, the trial court ordered on August 28, 1995:
The Department of Ecology, through its appropriate departments and personnel, shall immediately investigate and completely process in a timely fashion all of plaintiffs' nine pending ground water [] applications and render a decision either approving or denying each such application.
CP at 164-65 (Writ of Mandamus at 1-2).
It is patently obvious, and beyond rational dispute, that the trial court simply ordered DOE to do what the Legislature had previously required it to do by statute. It is equally clear that the majority of this court is thwarting the legislative will at the expense of the legal rights of this citizen.
This is the nub of it. However I would add a few more specific comments about the majority opinion.
The majority's analysis begins with the citation to RCW 34.05.570(4)(c) for the proposition that relief for an aggrieved person may be granted by a court if the court determines the end action is:
(i) Unconstitutional;
(ii) Outside the statutory authority of the agency or the authority conferred by a provision of law;
(iii) Arbitrary or capricious; or
(iv) Taken by persons who are not properly constituted as agency officials lawfully entitled to take such action.
RCW 34.05.570(4)(c); Majority at 144. I believe Mr. Hillis is entitled to relief under subparts (i) through (iii). Extreme delay in processing a permit is unconstitutional because it violates due process. Norco Constr. Inc. v. King County, 97 Wash.2d 680, 685-86, 649 P.2d 103 (1982). It also violates due process because it is unduly oppressive upon individuals. West Main Assocs. v. City of Bellevue, 106 Wash.2d 47, 52-53, 720 P.2d 782 (1986); Sintra, Inc. v. City of Seattle, 119 Wash.2d 1, 829 P.2d 765, cert. denied, 506 U.S. 1028, 113 S.Ct. 676, 121 L.Ed.2d 598 (1992); Guimont v. Clarke, 121 Wash.2d 586, 854 P.2d 1 (1993), cert. denied, 510 U.S 1176, 114 S.Ct. 1216, 127 L.Ed.2d 563 (1994); Robinson v. City of Seattle, 119 Wash.2d 34, 50, 830 P.2d 318, cert. denied, 506 U.S. 1028, 113 *156 S.Ct. 676, 121 L.Ed.2d 598 (1992); Lawton v. Steele, 152 U.S. 133, 137, 14 S.Ct. 499, 501, 38 L.Ed. 385 (1894). It is also unconstitutional because it is "arbitrary and capricious" in that it is contrary to law. State ex rel. T.B. v. CPC Fairfax Hosp., 129 Wash.2d 439, 452-53, 918 P.2d 497 (1996); Cobb v. Snohomish County, 64 Wash.App. 451, 459, 829 P.2d 169 (1991). Bateson v. Geisse, 857 F.2d 1300 (9th Cir.1988) (government acts arbitrarily when it denies a properly filed land use permit without lawful authority); Parkridge v. City of Seattle, 89 Wash.2d 454, 459-60, 573 P.2d 359 (1978).
By statute Ecology is obligated to process Hillis's applications. RCW 90.03.290 states that once an application is properly filed it "shall" be Ecology's duty to process it. This statutory directive is mandatory, not permissive. See Griffin v. Eller, 130 Wash.2d 58, 77, 922 P.2d 788 (1996) (use of word "shall" in a statute generally creates a mandatory duty). As a basic legal tenet when the law imposes a duty to act without providing a specific time frame the actor must perform without delay. See Larsen v. Lilly Estate, 34 Wash.2d 39, 45, 208 P.2d 150, 10 A.L.R.2d 580 (1949) (when the law allows or requires someone to act "and no time is fixed for its exercise he must do so within a reasonable time."). Accord State ex rel. Huntington Ins. Agency, Inc. v. Duryee, 73 Ohio St.3d 530, 653 N.E.2d 349 (1995) (where the law requires the superintendent of insurance to process applications for licensure, the superintendent must act "promptly"; a two year delay was unreasonable and, accordingly, a writ directing immediate processing was proper). If any delay is unreasonable, certainly an eight year delay is neither reasonable, "prompt," excusable, nor is it lawful. "Scandalous" would be a better word.
When an agency such as Ecology is under a legal duty to take action and violates that duty, an aggrieved party may seek judicial review as a matter of right. And he would be foolish not to. RCW 34.05.570(4)(b). Professor Andersen explains: "Because inaction can be a powerful form of agency action in some circumstances, judicial review of inaction serves the conventional purposes of protecting citizens and keeping agencies within legislatively prescribed bounds." William R. Andersen, The 1988 Washington Administrative Procedure ActAn Introduction, 64 Wash. L.Rev. 781, 844 (1989). A court is statutorily empowered to order the agency to act. RCW 34.05.574(1) ("the court may ... order an agency to take action required by law."); see also State ex rel. Greive v. Martin, 63 Wash.2d 126, 385 P.2d 846 (1963) (holding that state must pay state officers whether or not moneys have been appropriated for their salaries); Ray v. Town of Camden, 533 A.2d 912 (Me.1987) (ordering planning board to process applicant's site plan). Under the statute, the court may order agency action if the inaction is unconstitutional, outside the agency's statutory authority, or is arbitrary or capricious. RCW 34.05.570(4)(c).
This statutory violation is so patently clear, and Hillis's claim for relief so patently justified, that even the majority opinion, and Ecology itself, "agree[ ] that RCW 90.03.290 gives [DOE] a duty to process water rights applications." Majority at 145. But it didn't process Hillis's.
From this point the majority ceases to discuss the legal duties of the state, or the legal rights of Hillis, but makes excuses for a government department obviously acting contrary to law. The majority claims the Legislature has not appropriated enough money for Ecology to process the Hillis permits. This claim is not only based upon a false factual premise but, in any event, is no legal defense.
Actually, while the trial court did find that Ecology's budget was cut in 1994 in an unspecified amount by the state Legislature, there is no finding that Ecology lacked the resources to process Mr. Hillis's applications after that date. CP at 158-59 (Finding 1.6). Moreover, had Mr. Hillis's applications been processed when they were received, they would have been processed in 1992, two years before the alleged budget cut. CP at 157 (Finding 1.3).
Even more fundamental to this legal concern is the majority's implicit assumption that the state government may be excused from performing its legal duties because it has chosen to allocate its resources elsewhere *157 or has better things to do than protect the legal rights of its citizens. I find no more validity to that proposition than this court would accord to a similar claim if made by a private person who violated the legal rights of others. Ironically, this "poverty" defense has now been uniquely asserted on behalf of the best financed and most powerful entity in this state.
The majority states: "[W]e have recognized that a statutory right can be enforced only up to the funding provided by the Legislature." Majority at 147. In support of this bizarre proposition, the majority cites City of Ellensburg v. State, 118 Wash.2d 709, 715, 826 P.2d 1081 (1992) (quoting Pannell v. Thompson, 91 Wash.2d 591, 599, 589 P.2d 1235 (1979)). Clearly, however, the relevant holding in Ellensburg is simply that "The power of appropriation is vested in the Legislature. It is the rare case where the judiciary interferes with that power." 118 Wash.2d at 718. But here the trial court did not order the Legislature to appropriate anything. Nor would this court if it were to affirm the trial court. Rather we would order an executive agency to fulfill its clear statutory mandate to process Respondents' applications without delay.
Requiring an agency, otherwise unaccountable, to fulfill its statutory duty is the proper role of the court. See RCW 34.05.570, .574. Governmental agencies are not above the law but under itlike everyone else. Moreover, refusal to protect the statutory legal rights of any citizen is a dereliction of judicial duty which, in effect, allows lawless government to vanquish innocent citizens.
The majority incredibly adds:
If we were to uphold the trial court's order directing Ecology to "immediately" process the Hillis applications, we presume many of the 5,000 other applicants, individually or in a class action, would seek to obtain an identical order.
Majority at 147.
Of course! And properly so. Courts exist just to hear such claims.
In the private sector, entrepreneurs, citizens, and private corporations are frequently subjected to much greater liability than this for violating the legal rights of others. But there we would not hesitate to restrain (if not punish) the wrongdoer. At minimum we would require the wrongdoer to fully compensate the innocent victim. The rule is no different when the state is a party.
The majority worries:
This would put Ecology in the legally untenable position of either violating a court order or violating the state constitution and RCW 43.88.130, which forbid agencies to expend any money in excess of the amount appropriated for a given purpose.
Majority at 147. Not so. There is nothing "untenable" about Ecology's "legal" position other than it has breached a legal duty and must be held accountable. If its position is indeed "untenable" it has only itself to blame for making it so. In any event "untenability" is not a legal defense.
The majority continues:
Such action by this Court would only further add to the significant problems of the present water permitting system.
Majority at 147.
No. The problem should be DOE's, not Hillis's. We do not add to the problem by enforcing the law, we put its consequences on the shoulders of the responsible party, and relieve the victim from this unfair burden. Such is justice. Nor should we immunize state government from the natural consequences of its lawlessness. Governmental immunity has been abolished by statute. See RCW 4.92.090; 4.96.010.
The way in which state government orders its affairs and internally allocates its resources is not a judicial question; although its violation of the legal rights of others certainly is. Accordingly, I would conclude the majority's issues two through four are nondispositive of the basic question before this court: Will the Hillis's legal rights be protected? That is the only question that matters.
I agree with the majority's disposition of issue number five, denying Hillis an award of reasonable attorney fees at this stage of the proceeding, although I recognize this burden *158 also cries out for relief. But Mr. Hillis has not identified an appropriate ground for an award of reasonable attorney fees under existing law, and I can express no opinion on his entitlement to such award pursuant to RCW 64.40.020 or 42 U.S.C. §§ 1983, 1988, or any other ground, since these possible approaches have not been briefed.
In conclusion, Mr. Hillis has the absolute statutory right to have his applications processed pursuant to RCW 90.03.290. DOE has violated its clear duty to process the applications and, by so doing, violated Hillis's right to have them processed. I would therefore affirm the trial court's order that the applications be promptly processed, thereby placing the government firmly under the law, not above it. For these reasons I dissent.
MADSEN, J., concurs.
NOTES
[1] A "Group B" system may be operated without a water right.
[2] The state was divided, by rule-making procedure, into 62 "water resources inventory areas" based on drainage basins many years ago. WAC 173-500-990.
[3] Since 1989, the mandamus statute has provided that a writ of mandamus is no longer available for state agency action which is reviewable under the Administrative Procedure Act, RCW 34.05. RCW 7.16.360. Instead of a writ, an order requiring performance should have issued pursuant to RCW 34.05.570(4)(b); RCW 34.05.574. See RCW 7.16.360; William R. Andersen, The 1988 Washington Administrative Procedure ActAn Introduction, 64 Wash. L.Rev. 781, 822 n. 252 (1989).
[4] Hillis argues to this Court that the trial court did not order Ecology to investigate the Hillis applications immediately, and that the court did not order Ecology to process the Hillis applications ahead of higher priority, competing applications. (Competing applications are those that may draw from the same water source.) Hillis appears to be arguing that the court just ordered Ecology to process all of the applications within Hillis's water source by order of priority before it considered applications in other parts of the state. We reject this argument as this construction of the trial court's order is not supported by the order or the record.
[5] It is within the province of the Legislature to decide that those individual property owners who want to appropriate public water (rather than other taxpayers) should bear part of the cost of an investigation to determine if water is still available for appropriation in a given water source. It is, however, difficult to understand how the Legislature could recognize that "water rights applicants have a right to know that the water rights program is being administered efficiently and that the fees charged for various services relate directly to the cost of providing those services," Laws of 1993, ch. 495, § 1, and then fail in subsequent legislative sessions to set any such fees after drastically cutting the budget of the severely backlogged water rights permit program.
[6] The state constitution, Const. art. VIII, § 4 (amend.11) provides:

No moneys shall ever be paid out of the treasury of this state, or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law ... and every such law making a new appropriation, or continuing or reviving an appropriation, shall distinctly specify the sum appropriated, and the object to which it is to be applied....
[7] RCW 43.88.130 provides:

No agency shall expend or contract to expend any money or incur any liability in excess of the amounts appropriated for that purpose....
[8] Where the Legislature has intended action be performed on an application in a set amount of time, the Legislature has provided a time limitation in the statute. See, e.g., RCW 58.17.140 (setting 90-day period for action on plat applications).
[9] See, e.g., In re Juvenile Director, 87 Wash.2d 232, 552 P.2d 163 (1976) (the judiciary has the inherent power to compel funding of its own functions).
[10] General adjudication of water rights in the Yakima River has been in litigation since 1977, involves thousands of parties, and significantly impacts the economy and future of those living in the Yakima River basin. Department of Ecology v. Yakima Reservation Irrigation Dist., 121 Wash.2d 257, 262, 850 P.2d 1306 (1993). That water adjudication case has twice been before this Court, and we have accepted it for review a third time. Department of Ecology v. Acquavella, 100 Wash.2d 651, 674 P.2d 160 (1983); Yakima Reservation Irrigation Dist., 121 Wash.2d 257, 850 P.2d 1306; Department of Ecology v. Acquavella, No. 63401-7, review granted Oct. 25, 1996 (argued Nov. 19, 1996).
[11] Hillis accuses Ecology of being inconsistent in arguing that the trial court's order violates other applicants' places in line while also arguing Ecology has the discretion to prioritize the order in which water basins will be assessed because that will result in some more recent applications being processed before older applications in other basins. Ecology concedes that it must decide applications by application date within any one water source because those applicants will be competing for the same limited resource. However, there is nothing in the statute which mandates that all applications be decided on a statewide chronological basis based solely on application date. The record reflects this would be an inefficient and unnecessarily time-consuming way for Ecology to investigate applications. All parties correctly recognize that once a water right has been appropriated, the holder of that right has a priority date that relates back to the date of the application. RCW 90.03.340. This, however, is a very different matter than concluding that applications must be individually processed by application date statewide even when a group of applications is within one water source and so could all be efficiently decided together. The cases which discuss an applicant's "place in line" do not indicate that such a statewide chronological basis is mandated.