271 P.3d 966 (2012)
167 Wn. App. 180
Jeffrey PROBST and a class of similarly situated individuals; and Mickey Fowler and Leisa Fowler, and a class of similarly situated individuals, Appellants,
v.
Washington STATE DEPARTMENT OF RETIREMENT SYSTEMS, Respondents.
No. 40861-9-II.
Court of Appeals of Washington, Division 2.
March 13, 2012.
*967 Stephen Kirk Festor, Stephen Kolden Strong, Bendich Stobaugh & Strong PC, Catherine Wright Smith, Smith Goodfriend PS, Seattle, WA, for Appellants.
Sarah Elizabeth Blocki, Attorney at Law, Olympia, WA, Timothy J. Filer, Samuel T. Bull, Foster Pepper PLLC, Seattle, WA, for Respondents.
WORSWICK, J.
¶ 1 Mickey and Leisa Fowler are class representatives for plaintiffs who are members of the Teachers Retirement System (TRS) and who transferred from TRS Plan 2 to TRS Plan 3 before January 20, 2002. The superior court dismissed their claim that the Department of Retirement Systems (DRS) was required to pay class members daily interest on the full balance of employee contributions transferred between Plan 2 and Plan 3. The Fowlers appeal, arguing that (1) common law required the DRS to pay daily interest, (2) the DRS's failure to pay daily interest was arbitrary and capricious, and (3) failing to pay daily interest effected an unconstitutional taking. We reverse, holding that although the DRS had authority to decide how to calculate interest, the DRS's interest calculation method was arbitrary and capricious because the agency did not render a decision after due consideration.[1]

FACTS
¶ 12 In March 2002, Jeffrey Probst, a member of the Public Employees Retirement System (PERS), requested to transfer his retirement plan from PERS Plan 2, a defined benefit plan, to PERS Plan 3, a plan that is part defined benefit and part defined contribution. Probst contacted the DRS when he realized that his contributions for the last *968 quarter of his enrollment in PERS Plan 2 had not accumulated interest, which, according to the DRS, was earned at a five and a half percent annual rate, compounded quarterly.
¶ 3 The DRS informed Probst that in order to receive interest on his full transferred balance, he would have had to wait until after the end of the quarter to transfer between plans. This is because the DRS uses the quarter's ending balance to calculate interest, and if an account has a zero balance at the end of the quarter, it earns no interest for that quarter. The DRS uses this calculation method for both PERS and TRS. Probst appealed before the DRS, claiming that (1) the DRS erroneously denied him accrued interest on his transferred balance, contrary to statute; (2) the DRS had failed to inform him of how interest was credited; and (3) the DRS erroneously deemed his transfer to have occurred before it actually did.
¶ 4 In January 2005, Probst filed a class action suit challenging the same interest calculation practices as his DRS appeal. Probst's suit claimed that the DRS breached its statutory and fiduciary duties by failing to pay accrued interest to Probst and a class of similarly situated individuals. In October, in Probst's DRS appeal, the DRS presiding officer granted summary judgment in favor of the DRS. Probst sought judicial review of the presiding officer's decision in superior court. In March 2006 the parties filed a joint motion to consolidate Probst's judicial review case with his class action lawsuit, which the superior court granted.
¶ 5 In June 2008 the superior court approved a partial settlement of the claims at issue. The settlement class included both PERS and TRS members who had transferred from Plan 2 to Plan 3 of their respective retirement systems after January 20, 2002. The class did not include TRS members who had transferred from TRS Plan 2 to Plan 3 before that date because the DRS argued that such claims were time-barred. Aside from the statute of limitations issue, the excluded class members had the same claims against the DRS as the settlement class. The parties agreed in the settlement agreement to base any litigation by those excluded from the settlement class on the record developed in Probst's case, subject to the right to seek additional discovery or dispute the relevance or admissibility of materials in the record.
¶ 6 The Fowlers became class plaintiffs in February 2009 when they filed an amended supplemental complaint as TRS members excluded from the settlement agreement. The Fowlers alleged that (1) the DRS breached a duty to accurately account for TRS member funds, (2) the DRS breached a duty to provide pertinent information to TRS members, and (3) the DRS breached a duty under the common law to pay daily interest on TRS members' accounts. The Fowlers sought declaratory and/or equitable relief, monetary relief, prejudgment interest, and attorney fees. The parties then stipulated to the certification of a class of plaintiffs consisting of all TRS members who transferred between Plan 2 and Plan 3 before January 20, 2002.
¶ 7 The superior court ruled that the Fowlers' claims were not time-barred because the statute of limitations did not begin to run until the plaintiffs discovered the injury. The superior court further ruled that the director of the DRS had the authority to calculate interest as it did and that the statutory language at issue did not require the DRS to pay daily interest. The superior court also ruled that the DRS had not acted arbitrarily and capriciously. The superior court thus affirmed the DRS's decision that the DRS was not required to pay daily interest[2] and dismissed the Fowlers' claims. The Fowlers appeal.

ANALYSIS

I. STANDARD OF REVIEW
¶ 8 We review a final DRS order under the Administrative Procedure Act (APA).[3]Int'l Ass'n of Fire Fighters Local *969 3266, AFL-CIO v. Dep't of Retirement Sys., 97 Wash.App. 715, 717, 987 P.2d 115 (1999). Under the APA, a party challenging agency action bears the burden of demonstrating that the action was invalid. RCW 34.05.570(1)(a). Although RCW 34.05.570(3) provides nine bases for overturning an agency order in an adjudicative proceeding, we address only two: whether the DRS erroneously interpreted or applied the law or acted arbitrarily or capriciously. RCW 34.05.570(3)(d), (i).

II. DRS's AUTHORITY

A. Plain Meaning of TRS Statutes

¶ 9 The Fowlers argue that the TRS statutes require the DRS to pay daily interest to TRS members who transfer from TRS Plan 2 to Plan 3. The DRS responds that the TRS statutes give the DRS authority to decide how TRS members earn interest. We agree with the DRS.
¶ 10 We review questions of statutory interpretation de novo and may substitute our interpretation for that of an agency. Jenkins v. Dep't of Soc. & Health Servs., 160 Wash.2d 287, 308, 157 P.3d 388 (2007). We accord deference to an agency's interpretation of a statute if "(1) the particular agency is charged with the administration and enforcement of the statute, (2) the statute is ambiguous, and (3) the statute falls within the agency's special expertise." Bostain v. Food Express, Inc., 159 Wash.2d 700, 716, 153 P.3d 846 (2007). But we do not defer to an agency on the scope of the agency's authority. US West Commc'ns, Inc. v. Washington Utils. and Transp. Comm'n, 134 Wash.2d 48, 56, 949 P.2d 1321 (1997).
¶ 11 The meaning of a statute is a question of law. Dep't of Ecology v. Campbell & Gwinn, LLC, 146 Wash.2d 1, 9, 43 P.3d 4 (2002). Our fundamental objective is to ascertain and carry out the legislature's intent. Dep't of Ecology, 146 Wash.2d at 9, 43 P.3d 4. We give effect to a statute's plain meaning as an expression of legislative intent. Dep't of Ecology, 146 Wash.2d at 9-10, 43 P.3d 4. But we may look to the statute as a whole, including related enactments, to determine plain meaning. Dep't of Ecology, 146 Wash.2d at 10-12, 43 P.3d 4.
¶ 12 RCW 41.32.817 permits TRS Plan 2 members to transfer to Plan 3. That section provides that upon transfer to Plan 3, "The accumulated contributions in plan 2 . . . shall be transferred to the member's account in the defined contribution portion established in chapter 41.34 RCW,[4] pursuant to procedures developed by the department." RCW 41.32.817(5) (emphasis added). RCW 41.32.010(1)(b) defines "accumulated contributions" for Plan 2 members as "the sum of all contributions standing to the credit of a member in the member's individual account. . . together with the regular interest thereon." And RCW 41.32.010(38) defines "regular interest" as "such rate as the director may determine."
¶ 13 These sections show that the legislature has delegated the DRS authority to determine the rate of interest credited when TRS members transfer between Plan 2 and Plan 3. But they do not specify whether the DRS may determine when and how interest is earned. However, in 2007, the legislature passed a new statute, RCW 41.50.033. LAWS OF 2007, ch. 493, § 1. This statute clarifies the legislature's intent regarding the DRS's authority, providing,
(1) The director shall determine when interest, if provided by a plan, shall be credited to accounts in . . . the teachers' retirement system. . . . The amounts to be credited and the methods of doing so shall be at the director's discretion, except that if interest is credited, it shall be done at least quarterly.
(2) Interest as determined by the director under this section is "regular interest" as defined in RCW . . . 41.32.010(23).[5]

*970 (3) The legislature affirms that the authority of the director under RCW 41.40.020 and 41.50.030 includes the authority and responsibility to establish the amount and all conditions for regular interest, if any. The legislature intends [this act] to be curative, remedial, and retrospectively applicable.
RCW 41.50.033 (emphasis added).
¶ 14 Thus, in RCW 41.50.033, the legislature expressly gave the DRS authority to determine not only the methods of crediting "regular interest," but the amount to be credited. However, the Fowlers argue that this did not give the DRS authority to determine how interest would be earned, only how it would be credited. The Fowlers argue that "crediting" interest is merely a bookkeeping function and is distinct from the actual earning of interest. Br. of Appellants at 35.
¶ 15 Under the plain meaning of the words "amount to be credited," the DRS has authority to determine how interest is earned. Authority over the amounts credited is de facto authority over how interest is earned. If the DRS was required to pay daily interest under RCW 41.50.033, then the DRS would lack any authority to determine the amounts creditedthe amounts to be credited would be fixed according to the rate of interest and the DRS would not have authority to vary them.
¶ 16 Agencies have implied authority to do everything lawful and necessary to effectuate the powers granted to them. Tuerk v. Dep't of Licensing, 123 Wash.2d 120, 125, 864 P.2d 1382 (1994) (quoting State ex rel. Puget Sound Navigation Co. v. Dep't of Transp., 33 Wash.2d 448, 481, 206 P.2d 456 (1949)). In order for the DRS to determine the amounts to be credited as RCW 41.50.033 expressly provides, it is necessary for the DRS to have authority to determine how interest is earned. Thus, under the plain meaning of the statute, the DRS has implied authority to determine how interest is earned.
¶ 17 The Fowlers' argument on this point also contravenes the principle that courts do not construe words of a statute to be nullities. Taylor v. City of Redmond, 89 Wash.2d 315, 319, 571 P.2d 1388 (1977) ("[I]t is a fundamental principle of statutory construction that courts must not construe statutes so as to nullify, void or render meaningless or superfluous any section or words of same."). If we accepted the Fowlers' argument, the words "amounts to be credited" in RCW 41.50.033(1) would be superfluous. Former RCW 41.32.010(23) already gave the DRS authority to determine the rate of interest before the legislature enacted RCW 41.50.033. And the words "and the methods of doing so" in RCW 41.50.033(1) clearly gave the DRS authority to determine the procedures for crediting interest. As such, in order for all the words of RCW 41.50.033(1) to have legal effect, the words "amounts to be credited" must give the DRS some authority beyond setting the rate of interest and the procedures for crediting it. The words "amounts to be credited" must authorize the DRS to determine how interest is earned, otherwise the words are superfluous.

B. Common Law Daily Interest Rule

¶ 18 The Fowlers argue that, rather than giving the DRS authority to decide how interest is earned, the TRS statutes incorporate the common law rule that interest is earned daily.[6], [7] In Potter v. Wash. State *971 Patrol, 165 Wash.2d 67, 76-77, 196 P.3d 691 (2008), our Supreme Court held that the courts should not recognize an abrogation or derogation of the common law absent clear evidence of legislative intent. But we have recognized that if a statute is inconsistent with the common law, it is deemed to abrogate the common law. State v. Butler, 126 Wash.App. 741, 750, 109 P.3d 493 (2005) (citing State ex rel. Madden v. Pub. Util. Dist. No. 1 of Douglas County, 83 Wash.2d 219, 517 P.2d 585 (1973)).
¶ 19 The Fowlers cite Faulkenbury v. Teachers' and State Employees' Ret. Sys. of North Carolina, 133 N.C.App. 587, 515 S.E.2d 743 (N.C.Ct.App.1999), to support their argument that "regular interest" incorporates the common law daily interest rule. Faulkenbury held that, under a North Carolina statute that was silent as to when "regular interest" would accrue, the common law daily interest rule applied. 515 S.E.2d at 746-47. In contrast here, the statutes at issue expressly give the DRS authority to determine when interest accrues. Faulkenbury is therefore distinguishable and unpersuasive.
¶ 20 The Fowlers further cite Teacher Retirement System v. Duckworth, 153 Tex. 141, 260 S.W.2d 632 (Tex.Civ.App.1953). There, the Court of Civil Appeals of Texas held that the agency administering a teacher retirement system lacked authority to abrogate the common law regarding the apportionment of annuities. 260 S.W.2d at 635. But the court based this conclusion on the fact that the statute was clear and unambiguous in adopting the common law rule. 260 S.W.2d at 637. Teacher Retirement Sys. is distinguishable and unpersuasive here, where the legislature has clearly expressed its intent to give the DRS authority to determine how interest is earned.
¶ 21 The legislature's intent to abrogate the daily interest rule as to the TRS is plainly evident in RCW 41.50.033. Giving the DRS authority to determine how interest is earned is inconsistent with the common law rule that interest is earned daily, abrogating the common law rule.
¶ 22 Moreover, even before RCW 41.50.033 was enacted, there was clear evidence that the legislature did not intend for "regular interest" to mean daily interest. RCW 41.50.215, originally enacted in 1937,[8] provides that "at the close of each fiscal year the department shall make an allowance of regular interest on the balance which was on hand at the beginning of the fiscal year in each of the teachers' retirement system funds as they may deem advisable." As noted above, we look to related provisions to determine the plain meaning of statutory language. RCW 41.50.215 deals with regular interest on TRS fund balances and thus is related to chapter 41.32 RCW. And RCW 41.50.215 does not contemplate the words "regular interest" incorporating the common law daily interest rule because it directs the DRS to credit "regular interest" based on beginning-of-year balances, not year-round daily balances. This provides clear evidence that, when the legislature defined for "regular interest" in RCW 41.32.010, it intended to abrogate the common law.
¶ 23 Because there is clear evidence that the legislature intended to abrogate the common law, the Fowlers' arguments fail. We hold that the TRS statutes do not require the DRS to play daily interest on balances transferred from Plan 2 to Plan 3.

III. ARBITRARY AND CAPRICIOUS AGENCY ACTION
¶ 24 The Fowlers next argue that, if the DRS had discretion to determine how interest is earned, the way the DRS calculates interest is arbitrary and capricious because it rendered its decision to use the quarterly interest calculation method without due consideration. We agree.
¶ 25 An agency's decision is arbitrary and capricious if it results from willful and unreasoning disregard of the facts and circumstances.[9]Overlake Hosp. Ass'n v. *972 Dep't of Health, 170 Wash.2d 43, 50, 239 P.3d 1095 (2010). "`Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous.'" City of Redmond v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 136 Wash.2d 38, 47, 959 P.2d 1091 (1998) (quoting Kendall v. Douglas, Grant, Lincoln & Okanogan Counties Pub. Hosp. Dist. No. 6, 118 Wash.2d 1, 14, 820 P.2d 497 (1991)); see also Hayes v. City of Seattle, 131 Wash.2d 706, 717, 934 P.2d 1179 (1997) (holding agency action arbitrary and capricious where agency's findings were too conclusory to show consideration of the facts and circumstances).
¶ 26 Before the legislature created the DRS, it directly controlled the state retirement systems by statute. Since the inception of the TRS in 1937, the legislature had defined "regular interest" as interest "compounded annually." LAWS OF 1937, ch. 221, § 1(22). In 1947, the legislature specified that regular interest was to be credited to TRS retirement funds based on "the balance which was on hand at the beginning of the fiscal year." LAWS OF 1947, ch. 80, § 19. In 1976, the legislature created the DRS and gave it authority to administer Washington's retirement systems. LAWS OF 1975-76, 2d Ex. Sess., ch. 105, §§ 4, 5.
¶ 27 In 1977, the director of the DRS issued a memorandum stating that "regular interest" would be set at five and a half percent annually, to be credited each quarter based on the previous quarter's accumulated balance. In 1978, the director circulated another memorandum reaffirming this calculation method but stated, "Programs should be developed to provide the means to credit interest monthly on the prior month end balance. I will provide instructions when the appropriate time arrives for instituting the monthly interest program." Administrative Record at 880-81. The record reveals no action taken to implement this planned change in interest calculation.
¶ 28 In 1989, the DRS evaluated a proposal to delay processing of interest payments to accommodate late employer transfers to the DRS. The DRS evaluated the impact of such a change and elected to continue using its current interest procedures. However, the DRS did not consider at that time whether to alter the quarterly interest calculation method in favor of more frequent compounding.
¶ 29 In 1992, in conjunction with developing a new database system, the DRS considered whether to continue using its quarterly interest calculation method. The agency considered alternatives including continuing its existing practices or moving to one of several methods for compounding interest monthly. In evaluating this decision, the agency recognized that the quarterly interest calculation method was unfair because an employer's late transfers to the DRS could lead to the employee being denied interest, a similar problem to the denial of interest that later occurred with transfers to Plan 3. Despite this problem, the DRS elected to continue using the quarterly interest calculation method. Nothing in the record shows that the DRS considered any advantages in continuing the quarterly calculation method; rather, the DRS elected to continue using the existing method despite the recognized unfairness it created.
¶ 30 Furthermore, in 2002, a DRS employee raised concern that the quarterly interest calculation method did not conform to industry standards. The record reflects that a DRS manager agreed that the matter should be considered. But the record does not show that the DRS undertook any consideration of the benefits and drawbacks of retaining the quarterly calculation method.
*973 ¶ 31 All in all, the record reflects that the DRS elected to continue using its historical interest calculation method without due consideration of the facts and circumstances. The DRS consistently recognized the advantages that would be realized by moving to a more frequent interest calculation, but rejected such a move without identifying any reasons for doing so. The decision to continue using the quarterly interest calculation method was therefore undertaken in willful and unreasoning disregard of the facts and circumstances, making it arbitrary and capricious.
¶ 32 We accordingly reverse the trial court's grant of summary judgment in favor of the DRS and remand for further proceedings.
We concur: PENOYAR, C.J., and VAN DEREN, J.
NOTES
[1] Because we decide this case on the grounds of arbitrary and capricious agency action, we do not reach the Fowlers' constitutional takings argument. Cmty. Telecable of Seattle, Inc. v. City of Seattle, Dep't of Exec. Admin., 164 Wash.2d 35, 41, 186 P.3d 1032 (2008) (appellate courts avoid deciding constitutional issues where case may be fairly resolved on other grounds).
[2] Although the DRS rendered its decision based on the PERS statutes, the DRS uses the same interest calculation for TRS as for PERS. Thus, the DRS decision applied with equal force to the Fowlers' case.
[3] Ch. 34.05 RCW.
[4] Chapter 41.34 RCW provides parameters for contributions to Plan 3 retirement systems.
[5] When RCW 41.50.033 was passed, the definition of "regular interest," was codified at former RCW 41.32.010(23) (2007) (Laws of 2007, ch. 50, § 1). The definition of "regular interest" has since been renumbered to RCW 41.32.010(38), but has not changed.
[6] The Fowlers rely in part on 32 HALSBURY'S LAWS OF ENGLAND § 127 at 78 (4th ed. 2005), for the proposition that, at common law, interest was deemed to accrue daily, regardless of when it was payable. Our Supreme Court has previously relied on Halsbury's Laws of England to determine the common law. See, e.g., Becker v. Lagerquist Bros., Inc., 55 Wash.2d 425, 429 n. 4, 348 P.2d 423 (1960). Although our Supreme Court has not spoken on the daily interest common law rule, the DRS does not contest that the rule is valid common law in Washington.
[7] To make this argument, the Fowlers rely in part on an analogy to RCW 41.04.445. That statute provides that employers must pay "accrued interest" on balances withdrawn from the retirement systems or paid to the employee as a lump sum. RCW 41.04.445(4). The term "accrued interest" is undefined in chapter 41.04 RCW. The Fowlers argue that this undefined term incorporates the common law daily interest rule for the purposes of chapter 41.32 RCW. But the words "accrued interest" never appear in the relevant TRS statutes. We decline to interpret an undefined term in a tangentially related statute as controlling over the plain meaning of the statutes directly at issue.
[8] LAWS OF 1937, ch. 221, § 7(2).
[9] The Fowlers cite Trustees of California State Univ. v. Riley, 74 F.3d 960 (1996), to argue that any accounting method that can be termed "inaccurate" is arbitrary and capricious. There, the Ninth Circuit Court of Appeals held that the Department of Education's method of calculating interest based on month-end balances instead of daily account balances was arbitrary and capricious under the federal Administrative Procedures Act. 74 F.3d at 966-67. The Ninth Circuit based this holding on the fact that the month-end accounting method caused "arbitrary and highly inaccurate calculations" that were "vulnerab[le] to manipulation." 74 F.3d at 967. Trustees of California State University did not address the relevant question under the Washington APA however: whether the agency acted in willful and unreasoning disregard of the facts and circumstances. The Fowlers cite no Washington law to support their contention that any calculation method that can be termed "inaccurate" is per se arbitrary and capricious under the Washington APA.