# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| JOHN ROSKELLEY, FAYETTE KRAUSE, SPOKANE AUDUBON SOCIETY, and the LANDS COUNCIL, | No. 48423-4-II |
| Petitioners, | |
| v. | |
| WASHINGTON STATE PARKS AND RECREATION COMMISSION, and MOUNT SPOKANE 2000, | UNPUBLISHED OPINION |
| Respondents. | |

JOHANSON, J. — John Roskelley, Fayette Krause, the Spokane Audubon Society, and the Lands Council are the Petitioners. They appeal the superior court's ruling that affirmed a Washington State Parks and Recreation Commission's (Commission) land classification decision. The Commission adopted a combination of natural, resource recreation, and recreation land classifications for a small portion of Mount Spokane State Park. Petitioners argue that the Commission's decision to classify as recreation land 279 acres of 800 acres at issue, was arbitrary and capricious. We hold that the Commission's decision was not arbitrary and capricious. The Commission gave due consideration to its policies, the natural resources in the area, and the potential impact of its decision. The Commission's decision is consistent with its policies and regulations, and within its discretion to reach a proper balance between environmental protection

and recreational use. Accordingly, we affirm the superior court and the Commission's land classification decision.

FACTS

I. BACKGROUND

The Commission manages state parks, which includes classifying park land for types of permissible uses. The mission statement of the Commission states, "'The [Commission] acquires, operates, enhances, and protects a diverse system of recreational, cultural, historical and natural sites. The Commission fosters outdoor recreation and education statewide to provide enjoyment and enrichment for all, and a valued legacy to future generations.'" Clerk's Papers (CP) at 287 n.I.

Mount Spokane State Park contains over 13,000 acres. Mount Spokane 2000 (MS 2000), a private concessionaire, operates an existing ski area on Mount Spokane that encompasses 1,425 acres or 10 percent of the park. In 1997, MS 2000 and the Washington State Parks Department agreed to explore whether MS 2000 could expand its ski area. In 1999, using the state park land classification system,[1] the Commission classified most of the park's 13,000 acres as natural or resource recreation lands. The Commission left unclassified an 800-acre area called the "Potential Alpine Ski Expansion Area" (PASEA), but planned to further study the PASEA to determine what the proper land classification should be in light of the proposed ski area expansion. Administrative Record (AR) at 859. The PASEA is near the existing MS 2000 ski area. Even though the PASEA

---

[1] Ch. 352-16 WAC. There are six classifications of state park areas including three at issue here: "recreation" that permits high-intensity outdoor use, "resource recreation" that permits medium- and low-intensity outdoor use, and "natural areas" that permits "low-intensity" recreation but focuses on preservation of significant ecological values. WAC 352-16-020(1), (2), (3).

2

remained unclassified, starting in 1999, the Commission directed its staff to manage the PASEA as a natural forest area while allowing backcountry skiing that was already occurring to continue.

At issue here is the Commission's classification of the 800-acre PASEA as natural (170 acres), resource recreation (351 acres), and recreation (279 acres). Of the 279 acres of recreation, 75 acres will be disturbed for ski runs. Petitioners object to only the 279 acres classified as recreation.

## II. INITIAL CLASSIFICATION EFFORTS AND RESOURCE POLICY

In August 2010, the Commission reevaluated the Mount Spokane State Park classifications and obtained an environmental impact statement (EIS) to document the potential impacts of new classification options. This evaluation excluded the PASEA. Also in 2010, the Commission adopted a new comprehensive resource policy: "Policy 73-04-1, *Protecting Washington State Parks' Natural Resources: A Comprehensive Natural Resource Management Policy*" (2010 Policy). The 2010 Policy's purpose is to "provide an over-arching natural resource" guide for the agency. CP at 267.

The 2010 Policy states,

This policy and its future implementing procedures seeks to capture current regulations and management guidelines, and to summarize the key points needed to promote the long-term protection and conservation of the natural resources in the agency's care. With institutional commitment and budgetary support, this policy will ensure the long-term protection of State Parks' natural resources.

CP at 268. Sections D.1 and D.2 of the 2010 Policy cover resource use. Section E.1 covers land classification.

In May 2011, the Commission attempted to classify the PASEA as a combination of recreation classification areas and prepared another EIS on the proposed ski expansion area. In September 2013, this court overturned the Commission's classifications.

From 2006 to 2014, MS 2000 contracted a number of studies on the need for more recreation in the PASEA and potential environmental impacts of expanding the skiing area. Meanwhile, a State Environmental Policy Act (SEPA), ch. 43.21C RCW, review of the possible ski expansion determined that a land classification action could have probable significant adverse impact on the environment. Thus, in November 2013, the Commission issued a determination of significance to review the potential impact. This process required another EIS. After seeking additional public comment, the Commission received 600 comments. In August 2014, after considering these comments, the Commission prepared another EIS, resulting in a draft environmental impact statement (DEIS), which set out several potential classification schemes for the PASEA and considered the potential impacts of the ski area expansion. During the 45-day comment period for the DEIS, the Commission received 704 comment letters and e-mails.

### III. FINAL EIS

In October 2014, the Commission released a final environmental impact statement (FEIS) in response to the comments made on the DEIS. The FEIS considered several alternative land classification options for the PASEA. These options included not classifying the area and continuing existing practices, classifying the area as different combinations of natural forest areas and resource recreation areas—neither of which would allow for any skiing—and an option called "Alternative 4." Alternative 4 struck a balance by proposing that 279 acres of the 800-acre PASEA be classified as a recreation area where skiing would be allowed, and a new chair lift and ski trails

4

could be built within a limited 75 acres. Alternative 4 also reserved the remaining 521 acres as natural or resource recreation areas where only low-intensity recreation would be allowed.

The FEIS acknowledged that the ski area expansion would require some removal of vegetation, separation of what was a continuous block of the vegetation already there, and the introduction of exotic species of vegetation. The FEIS further noted that habitat fragmentation could impact wildlife by causing stress responses, breeding and rearing disturbances, displacement or avoidance of the site, increased accessibility to predators, reduction of habitat and woody debris used for cover, and habituation to humans. It also proposed mitigation measures to address those concerns. The FEIS did not explicitly mention sections D.1, D.2, or E.1 of the 2010 Policy.

IV. COMMENTS AND LAND CLASSIFICATION

On November 19, the Commission held a public meeting to obtain final comments before selecting a land classification for the PASEA. One Commission member stated that the Commission reviewed all iterations of the EIS statements and all comments received following each EIS. The commissioner also noted that the Commission took public comment related to the PASEA development 12 times leading up to this decision.

Some commenters advocated that the PASEA be classified to restrict recreation. Some of these comments noted that the PASEA forests "meet or exceed all agency Natural Forest criteria and represent the highest level of natural resources quality in the state park system (and the state of Washington as well)," that the PASEA is part of a continuous area of "old-growth" forest of "uncommon quality" representing a "valuable conservation asset," that some state and federally protected wildlife species potentially occur in the PASEA, that the PASEA contains resources that provide habitat to support wildlife, and that the ski expansion would result in permanent loss,

5

conversion, or fragmentation of wildlife habitats resulting in decreased mobility by wildlife that will be difficult to mitigate. CP at 214, 151, 154.

Proponents of a recreation classification that would allow for the ski area expansion commented that because the PASEA has high snow quality, it may enjoy more resilient snow packs than other slopes and could expand the ski season. Proponents also commented that the expansion will add needed beginner to intermediate ski terrain, that there was a history of skiing near or in the PASEA, that the PASEA was already a popular destination for backcountry skiers, and that because the PASEA remains unclassified, MS 2000 cannot patrol or maintain the area other than regularly providing emergency response to lost or injured skiers within the PASEA.

The Commission took comments from members of the Spokane Tribe of Indians (Spokane Tribe).[2] The Commission staff noted the Spokane Tribe's past cultural uses on Mount Spokane generally, and in the PASEA in some cases, as well as past recreational uses, including snowshoeing, biking, snowmobiling, and birding.

Counsel for the Lands Council stated that the Commission should be guided by its 2010 Policy. He also expressed his opinion about which classifications were allowed and which were not.

On November 20, the Commission met to vote on the land classification. One commissioner asked a Commission staffer to discuss the opinion offered by counsel for the Lands Council that the section of the 2010 Policy applied to the circumstances at issue and would preclude the ski area expansion. The staffer replied that section E.1 does "discuss that our typical

---

[2] The Spokane Tribe filed an amicus curiae brief opposing the Commission's land classification.

procedure with areas of significant natural resources would be a protected classification of either a Natural Forest Area, Natural Area or Natural Area Preserve, or in some circumstances Resource Recreation." AR at 755. The Commission staffer also noted that "there are significant natural resources within the PASEA." AR at 752. But the staffer did not comment on the Lands Council's counsel's opinion that section E.1 precluded a recreational classification.

The Commission staff recommended Alternative 4, the mixed use classification for the PASEA ultimately adopted by the Commission:

> Staff believes that Alternative 4 advances the Commission's mission by addressing the desire for active recreational use of Mount Spokane and opportunities for expanded winter recreation activities as expressed by participants in the public planning and environmental review process. This alternative also provides a suitable balance of protection to natural resources by limiting uses and development in the majority of the PASEA.

AR at 865.

The Commission did not specifically discuss section E.1 or the 2010 Policy further. But it did state on the record that it was a tough decision, that the PASEA contained "pristine forest" of a unique quality, that there was a history of skiing in the PASEA, that the information in the FEIS was adequate to help guide efforts to minimize and mitigate the environmental impacts of the development, and that they must balance preservation and promoting recreation. The Commission concluded that Alternative 4 lessened the proposed development of 400 acres to 279 with higher standards of protection in the development plan, and that adding a chair lift to the PASEA would address a safety concern by better enabling ski patrol to evacuate people from that area. The Commission voted five to two to select Alternative 4 to classify 279 acres as a recreation area, allow only 75 acres for ski runs, and to classify 521 acres as natural or resource recreation areas.

## V. PROCEDURAL HISTORY

In March 2015, petitioners filed a petition for judicial review via constitutional writ of review[3] of the Commission's land classification. On November 20, the superior court affirmed the Commission's land classification. The Petitioners appeal. MS 2000 joined the Commission as respondents.[4]

## ANALYSIS

Petitioners argue that the Commission's land classification decision was arbitrary and capricious because the Commission's policies precluded the recreation classification, the Commission ignored the evidence of the area's natural resource value, and the Commission did not offer an explanation for the deviation from their 2010 Policy. The Spokane Tribe, amicus, adopt the Petitioners' arguments and additionally argue that the Commission's decision also ignored the cultural resources section D.2 of the 2010 Policy. We disagree.

## I. STANDARD OF REVIEW

Our review of an administrative decision is de novo. *Leavitt v. Jefferson County*, 74 Wn. App. 668, 677, 875 P.2d 681 (1994). An appellate court stands in the same position as the superior court to review an administrative decision. *Wenatchee Sportsmen Ass'n v. Chelan County*, 141 Wn.2d 169, 176, 4 P.3d 123 (2000). And the appellate court applies the proper standard of review

---

[3] The purpose of a constitutional writ of review is to enable a reviewing court to determine if an administrative decision was illegal or manifestly arbitrary where a statutory writ or a direct appeal are unavailable. *Saldin Sec., Inc. v. Snohomish County*, 134 Wn.2d 288, 292-93, 949 P.2d 370 (1998).

[4] MS 2000's joinder incorporates all of the Commission's arguments and authorities without making any additional arguments.

No. 48423-4-II

directly to the record from the administrative proceeding and not to the findings and conclusions of the superior court. *D.W. Close Co. v. Dep't of Labor & Indus.*, 143 Wn. App. 118, 125-26, 177 P.3d 143 (2008).

The proper standard of review of an agency action via constitutional writ of review is to use the illegal[5] or arbitrary and capricious test. *Saldin Sec., Inc. v. Snohomish County*, 134 Wn.2d 288, 292, 949 P.2d 370 (1998). An agency's action is "arbitrary and capricious if it is willful and unreasoning and taken without regard to the attending facts or circumstances." *Wash. Indep. Tele. Ass'n v. Wash. Utils. & Transp. Comm'n*, 148 Wn.2d 887, 905, 64 P.3d 606 (2003). "[D]eference to the agency's interpretation is particularly appropriate where its own regulations are concerned." *Postema v. Pollution Control Hr'gs Bd.*, 142 Wn.2d 68, 86, 11 P.3d 726 (2000).

## II. COMMISSION POLICIES AND RULES

### A. COMMISSION POLICIES

The 2010 Policy "provide[s] an over-arching natural resource" guide for the agency. CP at 267. Specifically, the 2010 Policy and its

> [f]uture implementing procedures seeks to capture current regulations and management guidelines, and to summarize the key points needed to promote the long-term protection and conservation of the natural resources in the agency's care. With institutional commitment and budgetary support, this policy will ensure the long-term protection of State Parks' natural resources.

CP at 268. The 2010 Policy further details what the Commission must consider when classifying land. Pertinent sections of the 2010 Policy related to land classification state,

---

[5] The parties do not argue that the Commission's decision is illegal.

9

**D. Resource Use**

1. Recreational facilities / activities

*State Parks has a mission of protecting resources of the system while providing for recreational use by the public.* Given the need to *balance these goals*, State Parks' staff will carefully analyze on a system-wide and / or park specific basis the long-term impacts to natural processes and resources resulting from facilities development, concessionaire practices, and recreational uses. A Commission-approved land classification will be developed for all parks to preserve the integrity of significant natural resources through the identification of appropriate recreation uses and developments. New developments will seek to minimize the impact of recreational activities to the natural resources of a park.

. . . .

2. Cultural resources

State Parks has the complex mission of protecting the natural and cultural resources of the system while encouraging their recreational and scientific use by the public. *No single resource consistently takes priority over others.* Where a resource of national, statewide or regional significance occurs, its protection will take priority over other resource protection and use efforts. Where significant natural and cultural resources exist at a site or within a landscape, agency staff must protect the integrity of all significant resources.

CP at 277.

**E. Planning**

1. Land classification

. . . Areas of a park containing natural resources of regional or statewide significance, unusual and /or sensitive habitats (*e.g.*, bald eagles), or a species of concern *should* be classified restrictively to allow only low-intensity uses and minor facilities development. *Typically*, one of three natural area classifications should be applied to such areas (Natural Areas, Natural Forest Areas, or Natural Area Preserves), although the "Resource Recreation" classification also provides a relatively high degree of resource protection and *may* offer the best option to address conflicting use issues at a specific site.

CP at 281.

B. COMMISSION RULES

The Commission uses a land classification system set out in WAC 352-16-020 to classify

state park land. That provision states in relevant part,

> **State park areas** are of statewide natural, cultural and/or recreational significance and/or outstanding scenic beauty. . . . They *may* be classified *in whole or part* as follows:
>
> (1)  **Recreation areas** are suited and/or developed for high-intensity outdoor recreational use. . . .
>
> (2)  **Resource recreation areas** are suited and/or developed for natural and/or cultural resource-based medium-intensity and low-intensity outdoor recreational use.
>
> (3)  **Natural areas** are designated for preservation, restoration, and interpretation of natural processes and/or features of significant ecological, geological or paleontological value while providing for low-intensity outdoor recreation activities as subordinate uses.
>
> . . . .
>
> (5)  **Natural forest areas** are designated for preservation, restoration, and interpretation of natural forest processes while providing for low-intensity outdoor recreation activities as subordinate uses.

WAC 352-16-20 (emphasis added).  A "recreation areas" classification allows for the clearing of vegetation to construct ski lifts and trails as well as for the operation of motorized equipment to groom ski runs.  Only this classification would allow for a high-intensity outdoor use including ski runs and formal ski trails to be constructed.  "Natural Forest areas" allow for low-intensity uses such as interpretive trails, hiking trails, cross-country ski trails, off-trail hiking, and backcountry skiing.  When managing the task of land classification, the administrative code further states that "[n]othing in this section shall be construed to allow uses that are otherwise prohibited, *nor prohibit uses that are otherwise expressly allowed*, by the commission, this code or by statute."  WAC 352-16-030(2) (emphasis added).

### III.  Recreation Classification in Light of Commission 2010 Policy

Petitioners argue that the Commission's land classification decision was arbitrary and capricious because section E.1 of the Commission's 2010 Policy precludes a recreation classification. The Spokane Tribe echoes this argument, but adds that section D.2 covering cultural

11

resources also precludes this classification. The Petitioners' and the Spokane Tribe's arguments fail.

## A. RULES OF LAW

Our initial examination focuses on the plain language of the regulation and "[i]f an administrative rule or regulation is clear on its face, its meaning is to be derived from the plain language of the provision alone." *Dep't of Licensing v. Cannon*, 147 Wn.2d 41, 56, 50 P.3d 627 (2002). "[R]egulations are interpreted as a whole, giving effect to all the language and harmonizing all provisions." *Cannon*, 147 Wn.2d at 57. We "'must not add words where the legislature has chosen not to include them,' and we must 'construe statutes such that all of the language is given effect.'" *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010) (quoting *Rest. Dev., Inc. v. Cananwill, Inc.*, 150 Wn.2d 674, 682, 80 P.3d 598 (2003)). Rules of statutory construction apply to administrative regulations. *State v. Burke*, 92 Wn.2d 474, 478, 598 P.2d 395 (1979).

Courts have interpreted "may" to be permissive language. *Scannell v. City of Seattle*, 97 Wn.2d 701, 704, 648 P.2d 435, 656 P.2d 1083 (1982) (holding that "[w]here a provision contains both the words 'shall' and 'may,' it is presumed that the lawmaker intended to distinguish between them, 'shall' being construed as mandatory and 'may' as permissive"). "Should" has also been interpreted as permissive language, expressing a desire or request. *Tennant v. Roys*, 44 Wn. App. 305, 313, 722 P.2d 848 (1986) (holding that "should" and "shall" are distinguishable). Although "should" can express a duty or obligation, another definition of "should" includes a nonemphatic request. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2104 (2002). "Shall" creates

a mandatory or imperative construction. *Scannell*, 97 Wn.2d at 705. "Priority" can be defined as "something requiring or meriting attention prior to competing alternatives." WEBSTER'S at 1804.

### B. POLICY SECTION E.1 DOES NOT PRECLUDE A RECREATION CLASSIFICATION

As in statutory interpretation, we review whether the plain language of the Commission's 2010 Policy precludes the Commission's recreation classification. *Burke*, 92 Wn.2d at 478; *Cannon*, 147 Wn.2d at 56. The 2010 Policy, section E.1, provides that areas of a park containing natural resources of regional or statewide significance "should be" classified restrictively to allow only low-intensity uses and minor facilities development. Use of the word "should" can indicate a permissive direction or request, not an absolute mandate. *Tennant*, 44 Wn. App. at 313; *and see* WEBSTER'S at 2104.

Petitioners' argument requires that we read words into the 2010 Policy that are not present. Rather than saying these classifications "must always" or "shall" be used, the use of "should" could mean that the Commission has discretion to choose a listed classification or another classification. The Commission could certainly have used the word "shall" if no discretion was intended. We must not add words where a regulatory drafter has chosen not to include them. *Lake*, 169 Wn.2d at 526; *Burke*, 92 Wn.2d at 478.

In addition, section E.1 says that "[t]ypically" one of three natural area classifications "should" be applied to such areas. CP at 281. But it also provides that a fourth option, "resource recreation," "may" offer the best option to address conflicting use issues at a specific site. This language suggests that no single classification is mandated and that there is a range of options, not simply the classifications suggested. *Scannell*, 97 Wn.2d at 704. The discretionary, rather than mandatory, nature of the language used supports the conclusion that section E.1 does not preclude

13

the Commission from adopting a mix of use classifications, including a recreation classification,

for a small portion of the PASEA.

### C. POLICY SECTION D DOES NOT PRECLUDE RECREATION CLASSIFICATION

Next, the Spokane Tribe argues that the Commission's classification decision did not

follow section D.2 of the 2010 Policy. The Spokane Tribe's limited argument states that because

the PASEA contains natural and cultural resources of regional significance, section D.2 required

the Commission to use land classifications listed only in section E.1. But section D does not dictate

this particular result. Thus, we reject this argument.

The 2010 Policy provides,

> **D. Resource Use**
>     1. Recreational facilities / activities
> State parks has a mission of protecting resources of the system while providing for recreational use by the public. Given the need to balance these goals, State Parks' staff will carefully analyze on a system-wide and / or park specific basis the long-term impacts to natural processes and resources resulting from facilities development, concessionaire practices, and recreational uses. . . .
>         . . . .
>     2. Cultural resources
> State Parks has the complex mission of protecting the natural and cultural resources of the system *while encouraging their recreational* and scientific use by the public. *No single resource consistently takes priority over others.* Where a resource of national, statewide or regional significance occurs, its protection will take priority over other resource protection and use efforts. Where significant natural and cultural resources exist at a site or within a landscape, agency staff must protect the integrity of all significant resources.

CP at 277 (emphasis added).

The Commission's mission is to protect resources while providing for recreational use.

The Commission must balance these goals. Resources of national, statewide, or regional

significance will take priority over other resource protection and use efforts. But no single resource

consistently takes priority over others. "Priority" can be defined as "something requiring or

14

meriting attention prior to competing alternatives." WEBSTER'S at 1804. And while the Commission must protect resources of regional or statewide significance, it must also encourage recreation.

Here, the Commission gave the significant cultural and natural resources of the PASEA considerable attention and consideration. It reviewed studies conducted between 2006 and 2014 about the ski area expansion's potential environmental impacts. It took public comment 12 times and reviewed each round of comments following the issuance of each environmental impact evaluation. And the record shows that the Commission reviewed this information and acknowledged the significant natural resources in the PASEA.

The Commission also heard comments from the Spokane Tribe. The Commission was advised by staff about the past cultural uses of the PASEA by the Spokane Tribe, as well as the past recreational uses of the PASEA including snowshoeing, biking, backcountry skiing, snowmobiling, and birding. Thus, over the course of eight years, the Commission gathered and considered a multitude of information about the resources of the PASEA to inform its decision before adopting the land classifications mentioned in section E.1 for 521 of 800 acres. The Commission's decision gives effect to competing provisions in section D by giving priority to resources of regional or statewide significance and placing a majority of the 800 acres in conservation classifications under section E.1 while encouraging recreation, as required, on only 279 acres.

The dissent relies on the portion of section D.2 that states, "Where significant natural and cultural resources exist at a site or within a landscape, agency staff must protect the integrity of all significant resources." CP at 277. But this language does not prohibit the mixed classification

specifically selected by the Commission to protect the integrity of the significant resources within the PASEA while encouraging recreation. The dissent ignores the surrounding language that says that "[n]o single resource consistently takes priority over others" and that the Commission shall protect resources while encouraging recreational use. CP at 277. Most importantly, the dissent ignores the language that the State Parks must "balance these goals." CP at 277. Instead, the dissent would mandate that the Commission give significant resources exclusive priority rather than allow the Commission discretion to balance competing goals.

We do not read section D.2 in isolation, but instead must give effect to all the words and provisions of the 2010 Policy. *See Cannon*, 147 Wn.2d at 57. We must also read the 2010 Policy in light of the regulations the policy was meant to effectuate. *See Cannon*, 147 Wn.2d at 57. On balance, the language of the regulations, as discussed more fully below, and the Commission's 2010 Policy give the Commission land classification discretion and do not mandate nor preclude any one classification. The Spokane Tribe fails to show how section D precludes the Commission's recreation classification of a small portion of the PASEA.

### D. RECREATION CLASSIFICATION NOT PRECLUDED

Finally, the administrative code and the Commission's interpretation of the 2010 Policy support the conclusion that sections E.1 and D do not mandate a particular result. The guiding administrative code states that park areas "*may* be classified *in whole or part*" using one of the listed land classifications, which includes recreation, and that the code should not be read to "*prohibit uses that are otherwise expressly allowed*" by the code. WAC 352-16-20, -030(2) (emphasis added). We do not read these provisions, as the dissent asserts, to say that an allowed category of use *has* to be applied *wherever* terrain or commercial demand is suited to the piece of

land being categorized. Rather, these provisions show that the Commission's land classification decisions are discretionary and no specific classification is *precluded.*

We also must give deference to the Commission's interpretation of its own policy. *Postema*, 142 Wn.2d at 86. And here, the Commission interpreted and applied its 2010 Policy consistent with its mission requiring it to balance preservation and recreation uses. We hold that the Commission did not willfully and unreasoningly disregard its 2010 Policy, and thus the Commission's decision was not arbitrary and capricious.

IV. CONSIDERATION OF THE PASEA'S NATURAL RESOURCES

Petitioners next argue that the Commission's decision was arbitrary and capricious because the decision was made without regard to the undisputed evidence of the high natural resource value of the PASEA lands. Again, we disagree.

An agency's action is arbitrary and capricious if it is taken without regard to the attending facts or circumstances. *Wash. Indep. Tele. Ass'n*, 148 Wn.2d at 905. "Where there is room for two opinions, an action taken after due consideration is not arbitrary and capricious even though a reviewing court may believe it to be erroneous." *Hillis v. Dep't of Ecology*, 131 Wn.2d 373, 383, 932 P.2d 139 (1997).

Section D.1 of the Commission's 2010 Policy states that the Commission must "balance" the goals of "protecting resources of the [park] system while providing for recreational use by the public." CP at 277. This section demonstrates that the Commission is not charged with prioritizing one goal—preservation or recreation—above the other, but must balance them.

## A. CLASSIFICATION IN LIGHT OF *RIOS* AND *PROBST*

Petitioners cite to *Rios v. Department of Labor & Industries*, 145 Wn.2d 483, 39 P.3d 961 (2002), and *Probst v. Department of Retirement Systems*, 167 Wn. App. 180, 271 P.3d 966 (2012), as analogous examples of agencies acting arbitrarily and capriciously by ignoring the evidence before them. But these cases are distinguishable.

In *Rios*, the Supreme Court reviewed the Department of Labor and Industries' (L&I) refusal to initiate rulemaking to mandate a blood-test program for workers who handled a certain pesticide. 145 Wn.2d at 486. The *Rios* court held that L&I's refusal to engage in rulemaking was arbitrary and capricious where L&I previously invested in researching the chemical found in the pesticide, authorized a study to identify ways to monitor the chemical, and made findings that the tests were "necessary and doable." 145 Wn.2d at 507-08. The *Rios* court held that L&I acted without regard to the attending facts and circumstances because L&I ignored its own findings about a dangerous chemical and a necessary, feasible way to monitor the chemical to protect employees. 145 Wn.2d at 508.

In *Probst*, the court held that the Department of Retirement Services (DRS) acted arbitrarily and capriciously when it rendered a decision about the method used to calculate interest for the teacher's retirement system. 167 Wn. App. at 194. Teachers raised concerns about the DRS continuing to calculate interest on a quarterly basis as it had in the past, and the DRS had evidence that using the quarterly calculation system could be unfair because it could lead to some of the teachers being denied interest entirely. *Probst*, 167 Wn. App. at 193. Rather than addressing the potential of denied interest, the DRS continued to use the quarterly method. *Probst*, 167 Wn. App. at 193. The *Probst* court held that the DRS' decision was arbitrary and capricious because

it did not consider the potentially unfair result of continued use of the quarterly method. 167 Wn. App. at 193-94.

The agencies' disregard of their own evidence in *Rios* and *Probst* is not analogous to the Commission's decision here. The Petitioners have not shown that the Commission ignored a potentially unfair result or that it disregarded the evidence before it. Instead, the record shows that the Commission made its decision based on all the evidence and after carefully considering and balancing competing interests.

As noted above, the Commission reviewed studies, took public comment, and reviewed the comments. Rather than ignoring the evidence presented about the natural resources in the PASEA, the Commission followed section D.1 of its 2010 Policy. The Commission gave priority to preservation and encouraged recreation by classifying 521 acres as natural or resource areas and 279 acres as a recreation area out of 800 previously unclassified acres. In reaching its decision, the Commission acknowledged the potential impacts of the expansion. And the Commission set out accompanying development plans and mitigation measures to minimize that impact on the PASEA's natural resources. This was a complex task that entailed significant public input and review of technical and scientific reports.

The record shows that the Commission considered several alternative land classifications for the PASEA, including not classifying it or selecting different combinations of natural forest area and resource recreation area classifications. Thus, the Commission did not disregard the natural resources in the PASEA, but considered the "typical" classifications set out in section E.1 for high value natural resource areas before selecting another classification combination.

The dissent argues that without acknowledgment or discussion of the preferred land classification categories in section E.1, section E.1 is effectively written out of the Commission's policies because it must balance its goals no matter what.[6] Setting aside that there is no legal requirement that the Commission cite to and analyze specific provisions of their guiding policy on the record, the Commission did not ignore its 2010 Policy.

The Commission acknowledged and gave priority to the section E.1 land classifications for the majority of the 800 acres at issue here. The dissent would eviscerate the Commission's discretion to protect the "diverse system of recreational, cultural, historical and natural sites" as required by the Commission's mission. CP at 287 n.I.

The Commission's action was not arbitrary and capricious where it expressly recognized the natural resource value of the area and gave the evidence before it due consideration before classifying 279 acres of the PASEA's 800 acres as a recreation area. *Hillis*, 131 Wn.2d at 383. We hold that the Commission's decision does not exhibit a willful and unreasoning decision taken without regard to the evidence presented about the PASEA's natural resource value, and thus it was not arbitrary and capricious.

---

[6] The dissent further argues that this conclusion is supported by SEPA. Neither Petitioners nor the Spokane Tribe rely on SEPA. And although the provisions of SEPA relied on by the dissent illustrate Washington's commitment to the preservation and enhancement of the natural environment, they do not establish that the Commission's land classification violated SEPA or the Commission's policies such that it was arbitrary and capricious.

## V. DEPARTURE FROM EXISTING POLICY

Petitioners argue that the Commission's decision was arbitrary and capricious because it represents a departure from section E.1 of the 2010 Policy, a policy departure requires an explanation, and no explanation or discussion of the policy was offered. The Spokane Tribe adopts this argument.[7] Petitioners and the Spokane Tribe's argument fails.

The parties do not cite to any Washington State cases that directly address the issue of an agency departing from its own policy. But Petitioners rely on two federal cases that apply the arbitrary and capricious standard. Because we held above that the Commission did not depart from its policy, we need not reach this issue. But here we reach it and hold that Petitioners' arguments are not persuasive.

1.    *CBS CORP. v. F.C.C.*[8]

In *CBS Corp.*, the Federal Communications Commission (FCC) fined the CBS network after an entertainer indecently exposed herself for nine-sixteenths of one second during a televised Super Bowl half-time event. 663 F.3d at 125. The Third Circuit Court of Appeals held that the FCC's actions represented a departure from its past policy because although the FCC prohibits

---

[7] The Spokane Tribe also argues that the Commission's reliance on historical use represents an arbitrary and capricious adoption of a new policy without explanation because the 2010 Policy does not require historical use analysis. The Commission noted that due to the "historical recreational activities in the PASEA," the PASEA was not a "typical natural area." Br. of Resp'ts at 17-18. And the Commission addressed the historical uses of the PASEA, including the uses by Spokane Tribe members as well as past recreational uses in or near the PASEA. But the Commission's acknowledgment of the PASEA's historical uses does not establish that the Commission adopted a new policy in which historical uses are determinative in a land classification decision.

[8] 663 F.3d 122 (3d Cir. 2011).

indecent behavior on television, at the time of the incident, the FCC also had an exemption in place for almost three decades for fleeting words and images. *CBS Corp.*, 663 F.3d at 125-26 (quoting *CBS Corp. v. F.C.C.*, 535 F.3d 167, 174-75 (3d Cir. 2008), *vacated by F.C.C. v. CBS Corp.*, 556 U.S. 1218, 129 S. Ct. 2176, 173 L. Ed. 2d 1153 (2009)). CBS Corp. argued that the Super Bowl incident fell under the exemption and the Third Circuit Court agreed, holding that "[l]ike any agency, the FCC may change its policies without judicial second guessing," but "cannot change a well-established course of action without supplying notice of and a reasoned explanation for its policy departure." *CBS Corp.*, 663 F.3d at 138. Because the FCC did not provide a reasoned explanation for departing from its fleeting image exception, its decision was arbitrary and capricious. *CBS Corp.*, 663 F.3d at 138.

Here, Petitioners do not demonstrate how the Commission's decision represents a departure from a "well-established course of action" as in *CBS Corp.* 663 F.3d at 138. In *CBS Corp.*, there were three decades of precedent of the FCC applying its policy in a certain way before departing from that precedent. 663 F.3d at 125-26 (quoting *CBS Corp.*, 535 F.3d at 174-75). Here, the Petitioners do not point to any precedent that demonstrate the Commission's land classification decision departs from its established course of interpreting its policies. Rather, Petitioners reiterate their argument that section E.1 "calls for a specific *outcome*" to classify the PASEA more restrictively than the Commission's decision, and therefore the decision was a departure. Br. of Appellants at 45. But as discussed above, the Commission's decision was an authorized action

under the permissive language of its 2010 Policy that directs the Commission to balance its preservation and recreation goals.[9]

2.      *RAMAPRAKASH v. FEDERAL AVIATION ADMINISTRATION*[10]

Petitioners also rely on *Ramaprakash*.  *Ramaprakash* is distinguishable.  In *Ramaprakash*, the Federal Aviation Administration (FAA) had a long-standing "'stale complaint rule'" meant to ensure timely prosecution of violations of rules meant to ensure pilots' ability to fly safely.  346 F.3d at 1123.  Despite this rule, the FAA prosecuted and suspended a pilot's license following a federal aviation regulation violation even though the offense occurred well outside of the timeframe of the stale complaint rule.  *Ramaprakash*, 346 F.3d at 1123.  The District of Columbia Circuit Court held that because the FAA's action significantly departed from its own precedent without providing any explanation, the action was arbitrary and capricious.  *Ramaprakash*, 346 F.3d at 1130.  The *Ramaprakash* court further stated that this action represented impermissible agency "'ad hocery'" because it left little certainty as to how the stale complaint rule would be applied in the future.  346 F.3d at 1130.

---

[9] Petitioners do not address the permissive nature of the word "should" in section E.1, but state in a footnote that the "use of the word 'should' rather than 'shall' does not allow the Commission to completely ignore its policy."  Br. of Appellants at 44 n.8.

[10] 346 F.3d 1121, 358 U.S. App. D.C. 146 (D.C. Cir. 2003).

Petitioners appear to argue that, as in *Ramaprakash*, the Commission engaged in "ad hocery" or a departure because the Commission chose a land classification not listed in section E.1 and neither the FEIS nor the Commission discussed why the Commission made that selection. For the same reasons articulated above with respect to *CBS Corp.*, we disagree.

3.      NO EXPLANATION REQUIRED WHERE THE COMMISSION FOLLOWED ITS EXISTING POLICY

Here, MS 2000 first requested expanding the ski area in 1997. The record demonstrates that since that time, the Commission's process to classify the PASEA and eventual land classification was not ad hoc as in *Ramaprakash*, but was in accord with the Commission's policy directives.

We hold that the Petitioners have not met their burden to show that the Commission acted arbitrarily and capriciously by departing from its 2010 Policy or by creating a new policy without offering an explanation. Instead, the Commission followed its existing policy, and thus an explanation for any "departure" is not required.[11]

---

[11] The Spokane Tribe cites to *Organized Village of Kake v. United States Department of Agriculture*, 795 F.3d 956, 966 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 1509 (2016). The dissent also relies on *Kake.* But the Petitioners do not show how the Commission's decision represents a departure or an inconsistent action from past actions. *Kake* is not determinative here.

No. 48423-4-II

CONCLUSION

In sum, we hold that the Commission's Mount Spokane State Park land classification was not arbitrary and capricious. We affirm the superior court and the Commission's land classification decision.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

JOHANSON, J.

I concur:

LEE, J.

25

No. 48423-4-II

BJORGEN, C.J. (dissenting) — The decision of the Washington State Parks and Recreation Commission to classify 279 acres[12] in Mount Spokane State Park as recreation land contradicted one of its policies and was inconsistent with another. Therefore, the Commission's decision was illegal and arbitrary and capricious under the standard of review in *Saldin Securities, Inc. v. Snohomish County*, 134 Wn.2d 288, 292, 949 P.2d 370 (1998) and should be vacated.

The Commission works for ends that would try a Janus. On one hand, it must provide facilities for outdoor recreation, including high intensity recreation. WAC 352-16-020. On the other, it must also provide areas that preserve and restore natural processes, as well as serve the interpretation of and education concerning those processes. *Id*. This difficult and critical balancing merits an ample scope of discretion, but at the same time demands safeguards against misuse of that discretion. Those safeguards are found in part in the Commission's description of its land classifications in WAC 352-16-020 and in its policies implementing those classifications.

I. THE COMMISSION'S LAND CLASSIFICATION CRITERIA

WAC 352-16-020 describes six categories under which state park land may be classified: recreation areas, resource recreation areas, natural areas, heritage areas, natural forest areas, and natural area preserves. WAC 352-16-020 prefaces those descriptions by stating that lands "may be classified in whole or part" under those descriptions. The term "may" in this context simply recognizes the Commission's authority to classify its land. That term does not give the Commission license to ignore or depart from the descriptions of its classifications in WAC 352-

---

[12] This is part of an 800-acre area referred to in the record as the PASEA, an abbreviation for "potential alpine ski expansion area."

26

16-020 or from its policies guiding those classifications. To do so would drain these safeguards of any effect.

Similarly, the statement in WAC 352-16-030(2) that "[n]othing in this section shall be construed to . . . prohibit uses that are otherwise expressly allowed, by the commission, this code or by statute" does not mean that an allowed category of use must be allowed wherever terrain or commercial demand is suited to it. To do so, again, would rob the classification descriptions of their effect and the Commission of needed discretion. This statement simply expresses the near tautology that an allowed category of use, such as skiing, cannot be prohibited on all park land.

All six of the classification categories in WAC 352-16-020 look to whether the uses allowed under the classification are suited or related to the land so classified. One category, though, goes further. The provision governing natural forest areas states:

> **Natural forest areas** are designated for preservation, restoration, and interpretation of natural forest processes while providing for low-intensity outdoor recreation activities as subordinate uses, and which contain:
> (a) Old-growth forest communities that have developed for one hundred fifty years or longer and have the following structural characteristics: Large old-growth trees, large snags, large logs on land, and large logs in streams; or
> (b) Mature forest communities that have developed for ninety years or longer; or
> (c) Unusual forest communities and/or interrelated vegetative communities of significant ecological value.

WAC 352-16-020(5). Through subsections (a) through (c), this provision lists precise characteristics that call for preservation and restoration. Although WAC 352-16-020 does not mandate this classification for all areas with these features, it expresses the Commission's determination that land with these characteristics warrants this level of protection.

## II.  THE 2010 POLICY

The most direct bridle on the Commission's discretion in balancing the interests of development and conservation is found in its own policies.  Of those, Policy 73-04-1, *Protecting Washington State Parks' Natural Resources:  A Comprehensive Natural Resource Management Policy* (2010), speaks most directly to this appeal.[13]

A.  The Effect of the 2010 Policy

At the outset, the terms of the 2010 policy make clear it is something more than a public relations device or an internal guideline that may be ignored at will.  First, the policy characterizes its purpose as providing "an over-arching natural resource policy for the agency." Clerk's Papers (CP) at 267.  More to the point, the policy states that

> [it] and its future implementing procedures seeks to capture current regulations and management guidelines, and to summarize the key points needed to promote the long-term protection and conservation of the natural resources in the agency's care.

CP at 268.  In similar vein, the policy states that

> [w]ith institutional commitment and budgetary support, this policy will ensure the long-term protection of State Parks' natural resources.

*Id.*

A policy that captures regulations and guidelines, that summarizes key points "needed" to serve a purpose, and states that with commitment and support it will "ensure" the fulfillment of that purpose, is more than a suggestion that may be spurned or embraced at will.  Instead, it is a policy intended to be followed.  Any other conclusion abandons both ordinary meaning and the safeguards needed to govern the Commission's balancing of development and conservation.

---

[13] This policy is referred to in this opinion as the 2010 policy.

B.    Section D.2. of the 2010 Policy

Two subparts of the 2010 policy are the most relevant to this appeal.  First, section D.2.,

Cultural Resources, states:

> State Parks has the complex mission of protecting the natural and cultural resources of the system while encouraging their recreational and scientific use by the public. No single resource consistently takes priority over others. Where a resource of national, statewide or regional significance occurs, its protection will take priority over other resource protection and use efforts. *Where significant natural and cultural resources exist at a site or within a landscape, agency staff must protect the integrity of all significant resources.*

CP at 277 (emphasis added).  The most salient feature of this policy is the mandatory nature of

the highlighted text.  The phrase "must protect" significant natural and cultural resources leaves

no room for quibble or dodge; it imposes a duty on the Commission.

The 2010 policy defines "cultural resource" as

> [a]n aspect of a cultural system that is valued by or significantly representative of a culture or that contains significant information about a culture. A cultural resource may be tangible or intangible. Biotic cultural resources include both plant and animal communities. Non-biotic examples of cultural resources include landscapes, districts, sites, structures, buildings and objects.

CP at 285.

Mount Spokane has been registered as a Traditional Cultural Property by the state

Department of Archaeology and Historic Preservation.  To its credit, the commission staff

recognized the depth and the intimacy of Native Americans' relation to Mount Spokane,

reaching back well before the American conquests.  In its report on the classification decision at

issue, the commission staff stated:

> As a singular peak, Mount Spokane is a significant landscape feature for Native American tribes. Mount Spokane was and is used by tribal elders and others for gathering traditional plants, including bear grass, huckleberries and serviceberries. Tribal elders report that some berries taste sweeter on the higher elevations of the

> mountain. Western red-cedar, which grows within the PASEA, is sacred to the tribes; its bark and bows are used for ceremonies and in medicine.
> The Spokane Tribe has been intimately connected to Mount Spokane for as long as oral history recounts. For the Spokane Tribe, the significance of Mount Spokane includes: the location of a creation myth; a vision quest and prayer site; an important hunting and gathering location for first foods and medicinal plants; and a territorial marker.

Administrative Record (AR) at 864. This evidence leaves little doubt that Mount Spokane is a significant cultural resource to Native Americans.

The evidence also shows the presence of significant natural resources on Mount Spokane. In 2007 the Washington Department of Natural Resources (DNR), through Natural Heritage Ecologist, Rex Crawford, Ph.D., responded to the proposal to expand the ski area on Mount Spokane. The Crawford report concluded that the area was "a valuable conservation asset of uncommon quality." CP at 154. The report also stated that

> [t]he northwest slope of Mt. Spokane (the ski expansion area) is part of the largest, least fragmented forest habitat in the Park and connects the park forests on the south to forests on and off the park to the north.

> Mt. Spokane Park appears not only to be the largest, least fragmented forest landscape locally but inspection of aerial photography in Washington and Idaho reveals that similarly sized and continuous forest areas do not occur within a 20 to 30 mile radius.

CP at 154-55.

These values are echoed in the Final Environmental Impact Statement (FEIS) for the proposed expansion, which notes that the PASEA includes a wildlife corridor linking Mount Spokane State Park with the rest of the Selkirk Mountains. According to the FEIS, the proposed ski area expansion could affect habitat connectivity through that corridor, which would limit the use of those areas by wildlife. The FEIS also notes that some of the species the Washington Department of Fish and Wildlife (WDFW) identified as endangered, threatened, priority or

30

candidate species have been seen in the PASEA, but also states they are seen throughout the park and does not state that any of the species make the PASEA their exclusive habitat.

In 2010, the project proponent, MS 2000, hired the Pacific Biodiversity Institute (Institute) to conduct biological surveys in the PASEA, which the Commission adopted as an appendix to the FEIS. The Institute surveyed and mapped 92 discrete areas within the PASEA and noted that the area contained "significant areas of old-growth forest." CP at 151. The Institute also found that the PASEA contained areas of tree debris and decay, as well as streams, springs, and small wetlands, all of which provide habitat for wildlife species.

Recognizing these values, a representative from DNR's Natural Heritage Program submitted a comment to the 2014 Draft Environmental Impact Statement advocating that the PASEA be left in its natural state. The WDFW also submitted a comment stating that elimination of forests for the ski area will result in permanent loss, conversion or fragmentation of wildlife habitats, resulting in decreased connectivity and travel by wildlife that will be difficult to mitigate. For these reasons, WDFW opposed the proposed ski area expansion.

As noted, section D.2. of the 2010 policy states that "[w]here significant natural and cultural resources exist at a site or within a landscape, agency staff *must protect the integrity* of *all* significant resources." CP at 277 (emphasis added). The Commission and the majority take the position that this requirement is met by protecting some of the resources in the PASEA and sacrificing others. This position, though, founders on section D.2.'s plain command to protect the integrity of *all* significant resources in these circumstances. It also raises a reductio ad absurdum by allowing successive decisions to develop part of the remaining protected area. For example, if the loss of significant cultural and natural resources in the 279 acres at issue here is

31

justified by protecting the remaining 521 acres of the PASEA, then a future decision to develop part of the 521 acres would also be justified by the protection of the shrinking remnant. Ultimately, this rationale would countenance the loss of any protection of the PASEA. Holding the Commission to the plain terms of its policy avoids this contradiction, but does not give exclusive priority to conservation, as the majority suggests. Instead, it simply follows the policy's recognition that some land is of such cultural or natural value that it demands protection in the balancing of development and conservation. The Commission is free to devote other lands to development if consistent with its policies, as it already has.

The evidence just summarized shows the presence of both significant cultural and natural resources in the expansion area. The natural resources, in fact, were significant enough to lead two state agencies with expertise to oppose the expansion. In no manner does expanding a downhill ski development into this area "protect the integrity" of these significant resources in that area. Therefore, the Commission's classification decision violates the mandatory terms of its own policy. As such, the Commission's action is both illegal and arbitrary and capricious under the standards discussed in the majority opinion.

C.       Section E.1. of the 2010 Policy

Section E.1. of the 2010 policy, Land Classification, states:

The Commission's 1995 land classification system provides management guidance for appropriate use and development intensities in specific areas of a park and the desired long-term boundary for that park parcel. *Areas of a park containing natural resources of regional or statewide significance, unusual and/or sensitive habitats (e. g., bald eagles), or a species of concern should be classified restrictively to allow only low-intensity uses and minor facilities development.* Typically, one of three natural area classifications should be applied to such areas (Natural Areas, Natural Forest Areas, or Natural Area Preserves), although the "Resource Recreation" classification also provides a relatively high degree of resource

protection and may offer the best option to address conflicting use issues at a specific site.

CP at 281 (emphasis added).

The evidence discussed above relating to wildlife corridors and the fragmentation of forests shows that the expansion area includes natural resources of regional or statewide significance. The evidence discussed above also suggests it contains species of concern. Section E.1., however, is not phrased in mandatory terms; it states instead that areas containing these resources "should be classified restrictively" in categories that do not allow the proposed ski area expansion. The question, then, is whether the Commission acted illegally or arbitrarily and capriciously by acting counter to its own directive that this area should not be classified to allow a development such as a downhill ski facility.

The majority cites *Scannell v. City of Seattle*, 97 Wn.2d 701, 704, 648 P.2d 435, 656 P.2d 1083 (1983), for the proposition that "should" is permissive, expressing a desire or request. *Scannell*, though, examined the meaning of "may," not "should." Unlike "may," the term "should" carries more the sense of what is expected or probable or what ought to occur. *See* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2104 (2002).

Thus, even though section E.1. does not impose a duty, it expresses the notion that downhill ski facilities ought not to occur or are not expected to occur in areas such as the PASEA. If an agency may deviate from this sort of direction without expressing any reason, it has reduced the preference, the "ought to," inherent in the term "should" to the choice among equally balanced options expressed by the term "may." To preserve the distinction between "should" and "may," some reason or justification for deviating from the clear preference of section E.1. must be required of the Commission.

The Commission argues that the record displays that justification in two ways. First, the Commission points to the consideration by it and its staff of the biodiversity polices of section A.1. of the 2010 policy. That section, however, requires the Commission to maintain native plants and animals to different degrees in different land classifications. It does not deal with the issue posed by this appeal, whether the adoption of a different classification may be sustained. That is governed by section E.1.

The Commission's second argument is stronger. The Commission, as well as the appellants, point out that the commission members wrestled with this decision, especially with the difficult balancing of the often opposing goals of recreational development and conservation. What the record appears to lack, though, is any consideration of the conservation preferences of section E.1. Without that consideration, the Commission's position necessarily is that a more generalized discussion of the difficulty in balancing conservation and development, without any discussion of the preferences of E.1. or how they apply to the PASEA, is enough to justify abandoning those preferences in reclassifying part of the PASEA.

This argument has some support, since the determination whether the preferences of section E.1. should be abandoned would include, among other matters, the balancing of development and conservation. Greater force, however, lies in the counter argument. If consideration of this balancing alone is enough to justify abandoning the preferences of E.1., without any discussion of those preferences or of the features of the PASEA that demand their application, then section E.1. is effectively written out of the Commission's policies, since the Commission must balance development and conservation in any event. To avoid that, the

Commission must consider and express some principled reason why the expectations or preferences of section E.1. will not be followed. The record does not show that it did so.

This conclusion is also supported by the State Environmental Policy Act, (SEPA), chapter 43.21C RCW. SEPA directs that, "to the fullest extent possible: (1) The policies, regulations, and laws of the state of Washington shall be interpreted and administered in accordance with the policies set forth in this chapter." RCW 43.21C.030. Among those SEPA policies is the recognition of "the responsibilities of each generation as trustee of the environment for succeeding generations," RCW 43.21C.020(2)(a), and the recognition that "each person has a fundamental and inalienable right to a healthful environment and that each person has a responsibility to contribute to the preservation and enhancement of the environment." RCW 43.21C.020(3). Reading the 2010 policy to allow the Commission to set aside the preferences of section E.1., with no reasoned explanation for abandoning those preferences, is not "in accordance with" these SEPA policies. *See also Puget Soundkeeper All. v. State, Pollution Control Hr'gs Bd.*, 189 Wn. App. 127, 148, 356 P.3d 753 (2015).

Finally, although not directly on point, the Ninth Circuit's decision in *Organized Village of Kake v. United States Department of Agriculture*, counsels the same conclusion. 795 F.3d 956 (9th Cir. 2015), *cert. denied*, 136 S. Ct. 1509 (2016). In 2001, the Department of Agriculture adopted a rule prohibiting road construction and timber harvesting in certain areas of the national forests (Roadless Rule). *Kake*, 795 F.3d at 960. With certain exceptions, the Roadless Rule applied to the Tongass National Forest. *Id.* In applying the Roadless Rule to the Tongass in 2001, the Department found that that "'the long-term ecological benefits to the nation of conserving these inventoried roadless areas outweigh the potential economic loss to [southeast

Alaska] communities'" from the Roadless Rule. *Id.* at 967 (alteration in original) (quoting 66 FR 3244-01, 2001 W.L. 27402.).

In 2003 the Department reversed its course, returning the Tongass to management through a local forest plan. *Id.* at 962. In doing so, the Department found, on the same record as was before it in 2001, that "'the social and economic hardships to Southeast Alaska outweigh the potential long-term ecological benefits'" of the Roadless Rule. *Id.* at 967 (quoting 68 FR 75136-01, 2003 WL 23021330).

In reviewing the 2003 action under the federal Administrative Procedure Act (APA), 5 U.S.C. 500 et seq., the court noted that the act requires it to set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* at 966 (citing § 706(2)(A)). This standard closely parallels the illegal or arbitrary and capricious test we apply to the constitutional writ of review now before us. *Cf. Saldin Secs., Inc.*, 134 Wn.2d at 292. In applying this standard *Kake* held that "'[u]nexplained inconsistency' between agency actions is 'a reason for holding an interpretation to be an arbitrary and capricious change.'" *Kake*, 795 F.3d at 966 (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981, 125 S. Ct. 2688, 162 L. Ed. 2d 820 (2005)).

More specifically, relying on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009), the Ninth Circuit held that the absence of a "'reasoned explanation'" for the inconsistency between the 2001 and 2003 findings violated the APA and was reason to vacate the 2003 rule. *Kake*, 795 F.3d at 969. The court noted that "'[a]n agency cannot simply disregard contrary or inconvenient factual determinations that it made in the past,

any more than it can ignore inconvenient facts when it writes on a blank slate.'" *Id.* at 969 (quoting *Fox*, 556 U.S. at 537 (Kennedy, J., concurring)).

Unlike *Kake* and *Fox*, this appeal involves an agency acting inconsistently with its policies, not a change in a rule or long-standing practice. Nonetheless, the rationale of *Kake* illuminates the present analysis as much as it did the Ninth Circuit's decision. By adopting section E.1., the Commission adopted a policy establishing a preference or expectation that high-intensity recreation facilities would not be allowed in areas with the characteristics of the PASEA. By reclassifying the 279 acres to allow downhill skiing facilities, it forsook that policy, giving no reasoned explanation for its deviation. Although the Commission may decide not to observe the preferences of its own policies, to abandon those polices with no reasoned explanation raises the same sort of unreasoning action found fatal in *Kake*. As such, the Commission's action was arbitrary and capricious for the same reasons as was the government's action in *Kake*.

The Commission's failure to give a reasoned explanation as to why it was repudiating the clear direction and preferences expressed in section E.1. was inconsistent with the terms of its policies and the rationale followed in *Kake*, as well as the interpretive standards of SEPA. Without such an explanation, even though the Commission honestly discussed the balancing between development and conservation, its reclassification of the 279 acres to allow high-intensity recreation should be deemed illegal and arbitrary and capricious.

CONCLUSION

The Commission's reclassification violated the mandatory terms of section D.2. of its 2010 policy and was inconsistent with section E.1. of the same policy. Under the standards for

37

No. 48423-4-II

constitutional certiorari in *Saldin Securities, Inc.*, 134 Wn.2d at 292, the reclassification should be vacated.

_____, C.J._____
Bjorgen, C.J.